[S. F. No. 2332.   Department Two. — February 26, 1901.]

**J. H. BARKER, Administrator of the Estate of John Carey, Deceased, Respondent, v. RICHARD HURLEY and KATE HURLEY, Appellants.**

Estates of Deceased Persons — Will — Money Given to Residuary Legatee — Express Trust not Shown. — Where a deceased person had a sum of money in bank, and after having made a will, giving legacies to his father and brother, and the residue of his estate to his sister, ordered the money drawn from the bank, and delivered it all to his sister, telling her to keep it all and give none of it to the father or brother, and gave no further directions as to executing the will, the fact that the legacy to the brother was subsequently paid, and that to the father was promised, does not establish a voluntary or express trust, or show that it was understood by the parties that the sister was to execute the will.

Id. — Certainty Essential to Creation of Express Trust. — In order to create an express trust, whether of real or personal property, the purposes of the trust, and its subject-matter and beneficiaries, must be clearly indicated with reasonable certainty.

ID.—IMPLIED TRUST — OPERATION OF LAW — STATUTE OF LIMITATIONS.— Where a trust, if it exists at all, is not created by agreement of the parties, but is only implied, or such as is, by operation of law, fixed upon the conscience of a person, the statute of limitations begins to run from the inception of the trust.

ID.—CONVERSION OF MONEY INTO LAND — NON-RECOGNITION OF TRUST— BAR OF STATUTE.—Although a trust in money cannot be evaded by its conversion into land, yet where there was no express trust as to the money, and more than four years had elapsed after the money was received and appropriated, and also after the land was purchased, and occupied as a homestead, without any recognition of a trust as to the money or the land, and with a full claim of ownership therein, an action brought thereafter, to enforce a trust in the money and in the land, is barred by the statute of limitations.

APPEAL from a judgment of the Superior Court of Mendocino County and from an order denying a new trial.   James M. Mannon, Judge.

The facts are stated in the opinion.

McNab & Hirsch, for Appellants.

There was no express trust, and any implied or resulting trust is barred by the statute of limitations, of four years from the receipt and appropriation of the money as belonging to Kate Hurley, and four years from the purchase and possession of the land as her own.   (*Hecht* v. *Slaney*, 72 Cal. 363; *Broder* v. *Conklin*, 121 Cal. 288, 289; *Nougues* v. *Newlands*, 118 Cal. 106, 107; *Chapman* v. *Bank of California*, 97 Cal. 159; *Love* v. *Watkins*, 40 Cal. 567; *Price* v. *Mulford*, 107 N. Y. 303; *Cone* v. *Dunham*, 59 Conn. 155; 8 L. R. A. 647, and note; *McMonagle* v. *McGlinn*, 85 Fed. Rep. 88; Perry on Trusts, sec. 865; Angell on Limitations, sec. 469; Wood on Limitations, secs. 200, 215; 13 Am. & Eng. Ency. of Law, 683, 684.)   There was no creation of an express trust, for want of certainty as to its terms. (Civ. Code, secs. 2221, 2222; *McMonagle* v. *McGlinn*, 85 Fed. Rep. 88.)

J. C. Ruddock, and Seawell & Pemberton, for Respondent.

There was no sufficient proof of a gift *causa mortis*.   (3 Am. & Eng. Ency. of Law, 1353; 3 Pomeroy's Equity Jurisprudence, sec. 1146.)   The law is unwilling to allow a gift *causa mortis* to take the place of a will.   (1 Parsons on Contracts, 236; *Hart* v. *Ketchum*, 121 Cal. 426, 430; *Knight* v. *Tripp*, 121

Cal. 674, 678, 682.) The trust was not subject to the statute of limitations until repudiated to the knowledge of the *cestui que trust*. (*Miles* v. *Thorne*, 38 Cal. 335; [1] *Fox* v. *Tay*, 89 Cal. 339; [2] *Janes* v. *Throckmorton*, 57 Cal. 368; *McClure* v. *Colyear*, 80 Cal. 378; *Roach* v. *Caraffa*, 85 Cal. 436; *San Pedro etc. Co.* v. *Reynolds*, 121 Cal. 74; *Estate of Rathgeb*, 125 Cal. 302.) The fact that other moneys were mingled does not destroy the trust in the land. (*Van Alen* v. *American Nat. Bank*, 52 N. Y. 1; *Moore* v. *Jones*, 63 Cal. 12–16.)

CHIPMAN, C.—Plaintiff brings the action to compel defendants to convey to plaintiff certain real estate, title to which is alleged to be held by them as trustees of the persons interested in the estate of John Carey, deceased. The court gave judgment for plaintiff, that defendants pay to plaintiff the sum of $3,509.25, failing in which, that the land described in the complaint be sold and said amount be paid from the proceeds thereof, and if there be not sufficient, that plaintiff have judgment for any deficiency. Defendants appeal from the judgment and from an order denying their motion for a new trial.

Plaintiff is the public administrator of Mendocino County, and defendants are husband and wife. John Carey was the brother of defendant Kate Hurley, and on June 6, 1893, was residing with his sister, Mrs. Hurley, on a farm eight miles from Mendocino City; he died June 8, 1893, leaving a last will, of which the following is a copy:—

"This is the last will and testament of John Carey, made June 6th, 1893. I give my father, Jas. Carey, of South Ring, Clonacilty, Ireland, the sum of five hundred ($500.00) dollars. To my brother, Maurice Carey, of Fort Bragg, the sum of three hundred ($300.00) dollars. And all the remainder of my estate to go to sister, Mrs. Kate Hurley. I request that my body be decently buried in the Catholic cemetery in Mendocino, and a suitable monument erected over my grave.

　　　　　　　　　　　　　　　　　　　"John Carey.

"Witness:
　"W. A. McCormack.
　"Clara F. Thurston."

---

[1] 99 Am. Dec. 384, and note.　　　[2] 23 Am. St. Rep. 474.

Shortly before his death, deceased had on deposit, in bank at Mendocino City, $3,509.25. Having been informed by the priest that "he was in danger of death," he sent his brother-in-law, Hurley, on June 6, 1893, with an order on the bank for this money, and Hurley brought it to Carey that day. Neither of the witnesses to the will was called to testify. Hurley testified that on his return with the money he met the doctor on the road, who informed him that he (the doctor) had drawn the will. It was executed before Hurley returned with the money. What took place when Hurley brought the money to Carey was testified to by defendants; no other persons were present. Defendant Hurley testified: "He asked me did I get it. I said, 'Yes.' I asked him if he wanted it counted, and he said, 'Yes.' I counted it out and placed it back where it was. He said, 'Now, providing I get well, or live, I might want this money back.' I was n't done putting it in the purse. I said, 'Here, take it now.' He reached out and took it, and he held it in his hand for probably a minute. He then said, 'Here, Kate; take it, keep it yourself, and keep it all and don't give them any of it. Maurice don't deserve it and father don't need it.' Kate is my wife, John Carey's sister. He handed it to her and said, 'Keep it all.' He sat up and reached it to her. He was pretty low at the time. This was on the 6th, and he died on the 8th, two days after. That afternoon I stayed in the room with him. I had further conversations with him in regard to the money. He said, 'If you stay on that train, you 're sure to be killed.' I was working on the logging train, for the Albion Lumber Company. He said, 'Take my advice; leave that train; you 've money enough now to get along without risking your life on that train.' He said he owed Mrs. Handley some money; also, Dr. Milliken, and Solomon, the Jew, at Navarro; he wanted them paid too."

Plaintiff applied for and was granted letters of administration in 1897. Mrs. Hurley testified at the hearing for letters, and her deposition was read in evidence by plaintiff. She testified that after her brother's death she wrote her father that her brother left him five hundred dollars under the will, and that the money was in her possession, and that she would pay him all of it; that she told her husband to pay her brother Maurice the three hundred dollars left him by the will. She testified: "I kept the rest of it because my brother

told me to keep it. He told me to keep it all. . . . I did n't send my father the five hundred dollars, because I was sick in bed. If he would have taken it, I would have sent it to him." She testified that she asked for letters because the attorney for the public administrator wanted to make some trouble for her; that he had written her that he would make her pay her father the five hundred dollars, and afterwards "stopped that, and wrote about the will"; "you [addressing the attorney] wrote me that you were going to sue me for the five hundred dollars. I thought there was no need of it. My father gave me the money. Then you wrote me to probate the will. Then I probated the will. When anybody asked me to show the will, I did it."

Maurice Carey testified that he was at Hurley's the day after his brother died; that Hurley told him that his brother had left him three hundred dollars by will, and his father five hundred dollars. A few days after the funeral, Hurley showed him the will and paid him three hundred dollars, and took his receipt, in which he relinquished all claims to the estate of deceased. It was alleged in the complaint that defendants, on November 18, 1893, purchased certain land with the money which they had received from Carey, and "took up their residence upon said land as their homestead, and have ever since had exclusive possession thereof, and have resided thereon," "and that by the said purchase and occupation the said defendants became trustees of a resulting trust, in favor of the successors in interest of the said John Carey, . . . and others interested in said property, and now hold said property as trustees," etc. It is admitted by defendants that they purchased the land, but they allege that it was for their own benefit, with money, part of which was the money received from said Carey and part other money. The foregoing is substantially all the testimony in the case.

The court, among other things, found, that, at his death, Carey was the owner of the money referred to, to wit, $3,509.25; that, prior to his death, he gave Hurley an order for said money, "to be drawn and held for the use of John Carey and his successors in interest, and that the said defendant Richard Hurley, by said order, drew the said money, and has ever since retained and appropriated the same to his own and the use of his wife, defendant Kate Hurley; that part of said money was mingled with defendants' money and was used to

purchase said land, but the exact amount of said $3,509.25 so used is not shown by the evidence, and said intermingling was the result of the wrongful acts and fault of defendants; that there was no gift *causa mortis,* or gift at all; but that "said sum of money was placed in the custody of defendants, to be restored to the said John Carey if he lived, and disposed of in accordance with the terms of his will if he died." The court found as conclusions of law, that defendants "became trustees of a resulting trust, in favor of the successors in interest of the said John Carey," and so hold the said property; and judgment was entered as above stated. The fact that Carey made a will was well known to the beneficiaries and other persons; there was no evidence and no finding that it had been fraudulently concealed, or concealed at all. There were but three beneficiaries of the will,—one of them, Maurice Carey, who was fully paid; there is no allegation and no evidence that the testator's father complains that he has not been paid or desires to be paid; and the only other legatee is defendant Kate Hurley. There is no allegation and no evidence that there are any creditors of the estate, and the only person claiming to have any interest in the action is the public administrator.

Defendants contend that the action is barred by the statute of limitations, which was duly pleaded, and we think this contention must prevail. They also claim that the findings are not supported by the evidence, either as to the trust or the gift.

The rule is well settled, that the statute of limitations runs in favor of a defendant chargeable as a trustee of an implied or constructive trust, and that it is not necessary, in order to set the statute in motion, that he should have denied or repudiated the trust. The statute begins to run when the wrong complained of is done, and under our code the limitation is four years. (*Hecht* v. *Slaney,* 72 Cal. 363.) The doctrine laid down in this case has been frequently approved. (*Nougues* v. *Newlands,* 118 Cal. 106; *Broder* v. *Conklin,* 121 Cal. 288.)

Respondent does not seriously dispute the rule as to implied or resulting trusts generally, but he contends that as the court found that there was no gift *causa mortis,* or gift at all, it follows that there must have been a voluntary or express trust; that section 2215 of the Civil Code classifies trusts as,—1. Voluntary, which are express trusts; and 2. Involuntary, which are implied or constructive trusts; that a trust resulting from

circumstances may be either voluntary or involuntary, or in
other words, may be express, implied, or constructive, and
that the circumstances here show a voluntary trust. The
direct testimony of Hurley and his wife is uncontradicted,
that Carey made a gift of all his money to Mrs. Hurley, his
sister; and there is nothing in the subsequent conduct of
defendants necessarily inconsistent with their testimony. But,
waiving the question of gift, so far as the direct testimony goes
there is none whatever that when Mr. Carey handed the money
to his sister he directed it to be disposed of under the will, as
the court found was the fact. The will had been executed
some hours before Hurley returned from Mendocino City with
the money, and the testimony was, that when Mr. Carey gave
the money to his sister he expressly stated that she was to
have all of it, and neither her brother nor her father was to
have any of it. It was after this money was handed to her,
although contemporaneously with that act, that he directed
Mr. Hurley, not Mrs. Hurley, to pay certain debts, which are
not referred to in the will, but he gave no direction whatever
as to executing the will. The evidence tending to show that
the money handed to Mrs. Hurley (which defendants insist
was given to her) was to be disposed of under the will was
circumstantial, and consisted of the facts, that defendants
knew there was a will; that Hurley paid Maurice Carey
three hundred dollars (the sum mentioned in the will) and
took his receipt; that Mrs. Hurley wrote her father that he
had been willed five hundred dollars, and she had the money
and would send it to him. We fail to discover sufficient in
these circumstances to establish a voluntary or express trust,
or that there was any understanding of the parties that defend-
ants were to execute the will. An express trust, or what our
Civil Code denominates a voluntary trust, subject to the pro-
visions of section 852, relating to trusts in real property, is
created, " as to the trustor and beneficiary, by any words or
acts of the trustor indicating with reasonable certainty,—1.
An intention on the part of the trustor to create a trust; and
2. The subject, purpose, and beneficiary of the trust" (sec.
2221); "and as to the trustee, by any acts or words of his
indicating with reasonable certainty,—1. His acceptance of
the trust, or his acknowledgment, made upon sufficient consid-
eration, of its existence; and 2. The subject, purpose, and bene-
ficiary of the trust." (sec. 2222).

That the trust in the present instance related in its inception to personal property does not change the rule as to its creation. The nature of the evidence to establish the trust may be different where it relates to personal property from that in the case of real property, but the strictness of the rule is not relaxed in the one case more than in the other, so far as it relates to the creation of the trust. In both, the purposes of the trust, the subject-matter, and the beneficiaries must be clearly indicated. The trust, if a trust at all, commenced with the appropriation of the money, and the trust character was not changed by the subsequent mutations of the property. As to the degree of certainty required in the creation of trusts, see *Wittfield* v. *Forster*, 124 Cal. 418, and *Sheehan* v. *Sullivan*, 126 Cal. 189.

It is not quite clear from the findings upon what theory the court found a resulting trust, but we presume it was because the money which was used to purchase the land was in part the money originally belonging to John Carey, and from which the court concluded that a trust resulted under section 853 of the Civil Code. (See, however, *Woodside* v. *Hewel*, 109 Cal. 481.)

But there never was any recognition by defendants that a trust existed as to the land; on the contrary, they treated it as their own. The trust with which they were charged, if at all, arose when they appropriated the money. This money could, of course, be followed, if impressed with a trust, wherever and howsoever invested. The trust could not be evaded by converting the money into land, but a subsequent change from money to land, or to any other form of property, after Carey's death, would not change the character of the trust with which defendants were originally charged. If in any view of the evidence a trust may be said to have arisen at all, it was not an express trust.

We search the evidence in vain to determine who were named by the parties as beneficiaries of the trust; we find nowhere any agreement, except as it may be implied; and there is not sufficient evidence to enable the court to define, even by implication, the terms, purposes, and beneficiaries of the trust; there are no words or acts of John Carey showing the extent and character of the trust intended by him to be created, and the evidence is wanting that defendants accepted a trust indicated with any sort of certainty by John Carey. The court found that the terms of the will were the terms of

the trust, but there is no evidence that John Carey ever so declared, or that defendants accepted any such trust.  That Mrs. Hurley, after the death of her brother, decided to pay her brother Maurice the three hundred dollars left him by the will, and expressed a willingness to pay her father the legacy left him, is consistent with her claim to all the money.   Many reasons might be suggested why she thought it best to respect these legacies, and yet maintain that she was not obliged to pay them; and Hurley testified that when he paid Maurice by Mrs. Hurley's direction, he told Maurice that she was not obliged to pay the money.   We do not find, in the case, evidence of a trust voluntarily assumed, which, by the understanding of the parties, was to be a continuing one, as was true in *Butler* v. *Hyland*, 89 Cal. 575, and *Odell* v. *Moss*, 130 Cal. 352, where it was held that the statute did not commence to run until the trust had been repudiated.   If defendants held the money upon any confidence or trust, it was such as by operation of law was forced upon their consciences, and was not created by agreement.   The complaint was filed November 27, 1897,—more than four years after defendants received the money; more than four years after they purchased the land, recorded the deed, and entered into possession and occupied the land as their homestead under claim of ownership; and more than four years had elapsed after occupying the land before any demand was made upon defendants.   Assuming that some sort of a trust arose, it was not such as would take it out of the operation of the statute of limitations, and the action was barred.

It becomes unnecessary to determine whether the public administrator could maintain the action, or the numerous other questions presented by the record and urged by appellants.

The judgment and order should be reversed.

Haynes, C., and Gray, C., concurred.

For the reasons given in the foregoing opinion the judgment and order are reversed.

Van Dyke, J., Harrison, J., Garoutte, J.

Hearing in Bank denied.