Decree affirmed, and appeal dismissed at costs of appellants.

# Appeal of the Fidelity Insurance, Trust and Safe Deposit Company, et al.

# Appeal of the German Roman Catholic St. Vincent's Orphan Asylum.

1. A. died intestate, unmarried and without issue, in 1865. B. was appointed administrator of his estate; he converted the same into money and filed his account, which was referred to an Auditor, who allowed the credit claimed, and distributed the balance to B. the brother of A., as his heir at law. The Auditor did not file his report until May, 1884.

[Appeal of Fidelity Ins., Trust and Safe Deposit Co. et al.]

·B. had died in 1883. C., representing himself to be the next of kin and heir at law of A., without accounting for his delay, filed his petition May, 1884, alleging that B. was the illegitimate brother of A., and thus not his heir at law, that unjust credits had been allowed A. in the settlement of his account, and prayed that the Auditor's report might be referred back to the Auditor, which was done. The Auditor took testimony, and made a second report, reporting that the allegations of C.'s petition were true, and after surcharging B. to a large amount, distributed the fund to C. *Held*, (*a*) reversing the court below, that C.'s claim was inequitable, and that he had been guilty of such gross *laches* as would not warrant a court of equitable jurisdiction to interfere in his behalf, (*b*) that a residuary legatee of B. did not have sufficient standing to appeal from the decree of the court below, surcharging B. and distributing the fund to C., and his appeal should therefore be quashed.

January 10, 1887. Before MERCUR, C. J., GORDON, TRUNKEY, STERRETT and GREEN, JJ. PAXSON and CLARK, JJ., absent.

APPEALS from the Orphans' Court of *Philadelphia county*: Of January Term, 1886, Nos. 352 and 353.

Appeals by the Fidelity Insurance, Trust and Safe Deposit Company and John H. Sloan, executors of the last will and testament of Adam J. Glasz, deceased, and of the German Roman Catholic St. Vincent's Orphans' Asylum of Philadelphia, and its vicinity, residuary legatees under the last will and testament of Adam J. Glatz deceased, from the decree of said court dismissing these exceptions to the Auditor's second report, distributing the estate of Frank J. Glasz deceased, and confirming the same. The facts of the case as they appeared in the court below appear in the following opinion dismissing the exceptions to and confirming the Auditor's second report.

When the balance due by an executor or administrator, who died without administering the estate, is ascertained, it must be awarded to the administrator *d. b. n.* of the original decedent for final distribution : Act of February 24th, 1834, Pur. 528, pl. 109; Commonwealth *v.* Strohecker, 9 W., 479; Montgomery's Estate, 7 Phila., 504 ; Carter *v.* Trueman, 7 Barr, 315. Nor do the facts of this case present any reason for an exception to the well settled rule.

The personal estate of the decedent Frank J. Glasz consisted wholly of city of Philadelphia loan, to the amount of $14,300. He died February 2d, 1865, intestate, unmarried and without issue, and letters of administration were granted to the acountant Adam J. Glasz, also now deceased. On February 16th, 1866, the administrator filed an account, in which he charged himself with the city loan, but with no other personal property ; and also, but improperly, with one-half of the supposed value of a certain piece of real estate, owned by himself and the decedent as tenants in common, but which remains unsold. Upon the credit side he claimed credit for the payment of fabu-

lous claims against the decedent, which, if allowed, would absorb nearly the entire estate.

The following extracts will suffice to show their extraordinary character, viz: " Board and attendance, $2,500; medicines, $150; doctors' bills, $250; traveling expenses, $650; clothing, $500; funeral expenses, $950; marble works, $455; mourning, $250 " (when the decedent died, unmarried and without issue); "and cash received, $6,500." The meaning of this last is inexplicable.

When it is remembered that no moneys were received by the administrator, and the city loan remains unconverted until the present day, it is evident these remarkable alleged payments, if made at all or to the extent charged, must have been defrayed from the individual moneys of the administrator, or they were simulated, for the purpose of appropriating to himself the entire estate.

On March 16th, 1866, the account was referred by our predecessors to an Auditor. He advertised notice of his appointment, as required by rule of court, and on the day appointed for the performance of his duties, was attended alone by the administrator. No creditor or other person interested appeared. From representations made to him by the administrator the Auditor was satisfied he was a brother of the decedent, his only heir at law, and the only person interested. And therefore concluded to allow the credits asked for and award to the administrator the balance remaining for distribution, subject to the payment of the collateral tax.

Unfortunately for the administrator, but fortunately, perhaps, for those ultimately entitled to the estate, he neglected to pay the costs of the reference to the Auditor, who therefore did not file his report, and cause the same to become a record of the court, and his award its judgment and decree, and also to transfer and assign the city loan to himself. They remained the assets of his decedent's estate, and continue so to the present.

In March, 1883, the administrator died, and his executors found among his assets the Philadelphia city loan referred to, still in the name of the original decedent. This occasioned an investigation, and, after a thorough search, the report of the Auditor was discovered, and on May 10th, 1884, filed in the office of the court, at the request of the executors of the deceased administrator. Thus, for the first time, it became of record.

On May 17th, 1884, before its final confirmation, and consequently a decree of the court, upon the petition of Peter Wagner, claiming to be one of the next of kin of the decedent, the report was recommitted to the Auditor "for further audit

and settlement of the account, to take testimony and report distribution of the balance found due by the deceased adminis-. trator to the administrator *d. b. n.*"

At the re-audit the deceased administrator was represented by the executors of his will, and numerous claimants, as heirs and next of kin of the original decedent, were represented by counsel. After a careful and patient investigation, the Auditor disallowed certain of the credits claimed in the account, reduced other allowances asked for, surcharged the deceased administrator with interest upon the city loan collected by him from January, 1865, to January, 1883, inclusive, and awarded the city loan and balance of moneys, thus ascertained to the administrator *d. b. n.*

The Auditor also found from the evidence that the deceased administrator was the illegitimate son of the mother of the decedent, born nearly five years prior to her acquaintance with the father of the decedent, and subsequent marriage to him, and consequently could not inherit from the decedent, the legitimate son of his mother, for the reason that the Act of April 27th, 1885, Pur. 934, pl. 40, while an enabling statute, restricts the capacity of illegitimates to inherit to and between the mother and her illegitimate child respectively.

These conclusions of the Auditor are the subject of the exceptions. After a careful consideration of the evidence, we think it fully sustains the finding of the Auditor, and his view of the law is in harmony with statute and authority.

Prior to the Act of June, 1883, Purd. 934, pl. 41, which followed Woltemate's Appeal, 5 Norris, 219, decided in view of the Act of 1855, illegitimate children might inherit from their mother, and the latter from her illegitimate child, but the former could not inherit from each other. Grubb's Appeal, 3 P. F. Smith, 55; Steckel's Appeal, 14 Id., 493; Woltemate's Appeal, *supra.* And while the Act of 1883 enables illegitimate children to take and inherit from each other in the same manner as children born in lawful wedlock, they " must be born of the same mother, and leave neither mother nor issue, capable of inheriting, surviving."

But we do not know of any statute which enables the illegitimate child to inherit the estate of the legitimate child of the same mother, except where, as provided by the Act of May 14th, 1857, Purd., 1149, pl. 9, the parents subsequently married, " such child or children shall thereby become legitimated, and enjoy all the rights and privileges as if they had been born during the wedlock of their parents." But the facts in this case show that the Act of 1857 is inapplicable. The father of the decedent was not the father of the administrator, and, although he married their mother, and the decedent was born in

lawful wedlock, yet the act contemplates that the children to be legitimated by a subsequent marriage must be born of the same parents. Our conclusion therefore is that the administrator could not inherit the estate as heir or next of kin of the decedent. That, as such administrator, he was liable for the interest upon the city loan collected by him to the date of his death. And the city loan, together with the amount ascertained to be due the estate by him or his estate, are properly awarded to the administrator *d. b. n.*

It was suggested at the argument that the claim of the next of kin, not having been made within seven years after the death of the intestate, is barred by the Act of April 8th, 1833, Purd., 934, pl. 38, which provides that "all such of the intestate's relations, and persons concerned, who shall not lay legal claim to their respective shares within seven years after the decease of the intestate, shall be debarred from the same forever," etc. But it is held that the Act does not apply to real estate, Blackmore *v.* Gregg, 2 W. & S., 182, and can only be pleaded where there has been a *bona fide* distribution, without notice of any claim by the heir or next of kin : Logan *v.* Richardson, 1 Barr., 372. In that case Judge ROGERS said : " This Act is intended to protect administrators and the personal representatives in the event of the distribution of the estate by the administrator without notice. When payment of the fund is made in good faith, it cannot afterwards be disturbed by an heir who has neglected to claim his share at the proper time. The administrator has a right to rely on the Act in such case for his shield and protection.

But it never was designed that it should be used for the unjust purpose of enabling the administrator to put the money, against all good faith, in his own pocket. The administrator is a trustee for the next of kin, and, while a trust subsists, the statute does not continue to run between the trustee and *cestui que trust.* Lapse of time in this, however, as in every other case, may raise a presumption of payment." Nor does the Act extend to the surplus of a sheriff's sale of the decedent's real estate : Carter *v.* Trueman, *supra.*

The exceptions are dismissed, and the report confirmed.

The appellants thereupon took these appeals, assigning for error the action of the court in dismissing these exceptions and confirming the said report.

*J. P. Klinges* and *Thomas R. Elcock,* for appellants.—The appellee was not entitled to have the audit opened. He was guilty of such gross laches as to preclude a court on equitable principles to interfere in his behalf : Gress' Appeal, 2 Harris, 463 ; *ex parte* Cress, 2 Whart., 494 ; Luken's Appeal, 7 W. &

S., 48; Penna. Company's Appeal, 5 Norris, 102; Eckert's Appeal, 6 W. N. C., 21; Maulfair's Appeal, 2 Atlantic Reporter, 530.

Bill for an account was dismissed solely on the ground of the laches of complainants, although they alleged in palliation their poverty and their situation as sea-faring people in an unsettled way of life: Pearson *v.* Belchin, 4 Vesey, *627.

Bill for an account was dismissed by reason of the difficulty of the account after a great length of time: St. John *v.* Turner, 2 Vernon, 418.

Courts of equity will sometimes refuse to grant relief, although the Statute of Limitations cannot be pleaded in bar, and although presumptions cannot arise from lapse of time, or may be conclusively rebutted. In such cases courts proceed upon the ground that the public convenience will not allow old and stale claims to be investigated, when many of the parties or witnesses are dead, or their memories impaired and vouchers are lost. *Expedit republica ut sit finis litium :* Perry on Trusts, section 869.

Mere lapse of time or delay in suing is such laches in the plaintiff in a certain class of cases that he is not entitled to relief unless he can explain the delay: Perry on Trusts, section, 869.

Thus, where a bill was brought against an executor for an account, there being no statute protection, and the presumption of a final settlement being rebutted, the court refused to open the account after a great lapse of time, when it was probable that most of the parties were dead and the vouchers and receipts were lost: Hunton. *v.* Davies, 2 Ch., 44; Hult *v.* Fletcher, 1 Atk., 457; Campbell *v.* Graham, 1 R. & M., 453; Anderson *v.* Bunvell, 6 Gratt., 405; Hercy *v.* Durwoody, 2 Bro. C. C., *287; Pollock *v.* Gardner, 1 Hare, 594; Taulum *v.* Williams, 3 Hare, 347; Provost *v.* Gratz, 6 Wheat., 480; Piatt *v.* Vattier, 9 Peters, 405; McKnight *v.* Taylor, 1 How., 161.

The Auditor should have filed his report *nunc pro tunc* as of 1886: Campbell *v.* Meiser, 4 John. Ch., 334; Benson *v.* Wolverton, 1 C. E. Green, 110; Durnham *v.* Dalling, 1 Id., 310; Bank of the U. S. *v.* Weisinger, 2 Peters, 481.

Where the plaintiff died, after an entry of an appeal from the decision of a vice-chancellor, and after the cause was ready for a hearing upon the appeal, but the fact of his death being unknown to the counsel, the cause was afterward heard and decided by the chancellor upon the appeal; it was held, that the decree upon the appeal might be entered *nunc pro tunc*, as of a day previous to the death of the plaintiff, and after the entering of the appeal: Vroom *v.* Ditmas, 5 Paige, 528; see Wood *v.* Keyes, 6 Paige, 478 (Emory *v.* Parrott, 107 Mass.,

[Appeal of German Roman Catholic St. Vincent's Orphan Asylum.]

104). What is the remedy in such a case? By bill of review, or by practice prior to the Act of 13th of October, 1840?

They would then have to show affirmatively fraud and account for laches. See the injustice done by the proceedings. Twenty years after an account is filed, all parties in interest dead, in consequence of the lapse of time all evidence by papers, etc., destroyed, the executors of the accountant are called upon to prove a case of which they have no knowledge, and all testimony lost. Can there be a greater hardship?

The purpose of the Act (1840) was to make a bill of review a matter of right, and at the same time to prescribe a limit to its exercise; Kinter's Appeal, 62 Pa. St. Rep., 318.

To justify a bill of review there must be error on the face of the account, or new facts arising since the decree, or newly discovered evidence: Riddle's Estate, 19 Pa. St. Rep., 431; Hartman's Appeal, 36 Id., 70; Green's Appeal, 59 Id., 235. It is never allowed to stand on strict law and against equity: Yeager's Appeal, 34 Pa. St. Rep., 173; Russel's Admin. Appeal, Id., 258; Stevenson's Exr's Appeal, 32 Id., 318. Unless the alleged errors in the account are set forth specifically and verified by oath or affirmation, the original decree will not be opened: Kachlein's Appeal, 5 Barr., 95.

*Theodore F. Jenkins,* for appellee.—The appeal of the German Roman Catholic St. Vincent's Orphans' Asylum of Philadelphia, and its vicinity, should be quashed, as it is in no way a party to the record in the court below, and as the appeal is not from a decree for the distribution of the estate of Adam J. Glasz, deceased, even though this appellant be a legatee under his will, which does not appear of record in the present cause, it has no standing to take an appeal from a decree in a collateral proceeding in which the executors of the last will of the decedent represents all parties interested in his estate.

Under the Act of 1834, an administrator *de bonis non*, is entitled to recover from the representatives of a former administrator the balance of an administration account, for the purpose of distribution: Carter *v.* Tureman, 7 Barr, 315: Connelly's Appeal, 1 Grant, 366; Commonwealth *v.* Strohecker, 9 Watts, 479; Estate of Austin Montgomery, 7 Phila., 504; Little *v.* Walton, 11 Har., 164.

Even though the deceased administrator would have been entitled to the entire assets as distributee, the amount in his hands must be paid to the administrator, *d. b. n.*, who is the only person who can make distribution: Lewis *v.* Ewing, 6 Har., 313.

Of course, the Act of April, 1833, Br. Purd., 934, pl. 38, does not apply, for as was said in Logan *v.* Richardson, 1 Barr, 372:

[Appeal of German Roman Catholic St. Vincent's Orphan Asylum.]

This act is intended to protect administrators and the personal representatives in the event of the distribution of the estate by the administrator without notice. When payment of the fund is made in good faith, it cannot afterwards be disturbed by an heir who has neglected to claim his share at the proper time. The administrator has a right to rely on the Act in such case for his shield and protection. But it never was designed that it should be used for the unjust purpose of enabling the administrator to put the money, against all good faith, in his own pocket. The administrator is a trustee for the next of kin, and, while a trust subsists, the statute does not continue to run between the trustee and *cestui que trust*. Lapse of time in this, however, as in every other case, may raise a presumption of payment.

Mr. Justice GORDON delivered the opinion of the court February 7th, 1887.

Some twenty-two years ago Frank J. Glasz, deceased, and his brother Adam administered on his estate. In 1866 the account of the said administrator was filed, and referred by the Orphans' Court for settlement and distribution to an Auditor. This Auditor, after complying with the legal requisites in the way of publication, etc., approved the account, and reported a balance of $882.92, which he awarded to the aforesaid Adam J. Glasz, as brother and next of kin of the deceased. But this Auditor neglected to file his report. Had he performed his duty as he ought to have done in proper time, we would not have had the present contention, for the time allowed by the Act of the 13th of October, 1840, for a bill of review has long since passed. As the matter now stands, it seems that the Auditor waked up to the consciousness of his duty in the way of filing his report so late as May 10th, 1884, so that technically the limitation prescribed by the Act does not apply, and, as a consequence, some nearly nineteen years after this account ought to have been confirmed and laid away with past things to be forever forgotten, and after death has set his irrevocable seal upon the lips of Adam J. Glasz, we have on the petition of one Peter Wagner, an alleged collateral heir of Frank J. Glasz, this whole matter ripped up, or, as it were, dug up from its grave, the account re-examined by the Orphans' Court, Adam J. bastardized, and his estate burthened with a cash charge of $22,000, together with $14,000, in city certificates which had been previously distributed to Adam J. Glasz, as brother and next of kin of Frank J. Glasz. We need hardly say that this change of base is an unexpected and alarming one to those interested in the estate now under consideration. What we have now to con-

sider is whether this condition of things ought to have been permitted. We may say, *in limine*, that the case of the appellee is wholly without merit, and rests upon a mere technical right. That the two younger Glaszs were children of the same mother, is not a matter of question; nor is there any doubt as to their brotherly relations and affection the one for the other. Adam, if we are to look to the evidence, was faithful in the discharge of his duties, as well to his mother and brother as to the business in which they were mutually engaged, and the probabilities are that, but for Adam, Frank would have had no estate to leave to any one. But now, some nineteen years after this matter ought to have been, and would have been, but for the neglect of the court's officer, put at rest, and after Adam's death, some collateral heir has discovered that he was a bastard, and therefore could not inherit from his own brother, and it is on this ground alone that the court below has seen fit to set aside its previous action, and surcharge the estate of the decedent to a ruinous amount, which in good conscience it ought never to have been called upon to pay. That this transaction is inequitable in the highest degree cannot be doubted by any impartial person. Is then the technical condition of things such as to compel us to adopt the conclusion of the court below? We think not. Time is an element of very material force in all courts which are governed by the principles of equity. This is illustrated by Gress' Appeal, 14 Pa., 463, where a citation on the representatives of a deceased guardian to file an account of his guardianship, some eighteen years after his appointment, was refused. This refusal was not put on the ground either of presumption of payment or of settlement with the ward, but, as Mr. Justice BELL, who delivered the opinion of this court, said: "It results altogether from the unwarrantable negligence of the party to call for an account, without offering any sufficient reason accounting for the delay." Yet in this case the guardian had neglected a positive statutory duty, which makes the case stronger than that under discussion, in that Glasz neglected no duty, and the effect of the action of the court below has been to visit upon his estate the default of its own officer. So in the case of McKnight *v.* Taylor, 1 How., 161, it was held, that after a delay of nineteen years and three months, it was too late to ask a court of equity to interfere to compel the execution of a trust, and it was therein stated by Mr. Chief Justice TANEY, citing Piatt *v.* Vattier, 9 Peters, 416, "that nothing can call a court of chancery into activity but conscience, good faith, and reasonable diligence, and where these are wanting the court is passive and does nothing; and therefore from the beginning of equity jurisdiction,

there was always a limitation of suit in that court." But it is
useless to multiply authorities upon a doctrine that is so well
established as to have become elementary, and we have only
to say, that a case more proper for its aplication than the one
in hand could scarcely be conceived. For nearly nineteen
years the appellee slept on his rights, nor does he allege in his
petition that he was not during all that time perfectly cogni-
zant of every fact set forth in that petition. It is only after
all these years, and after Glasz's power to defend his estate
has been effectually destroyed by death, that he comes into a
court of equitable jurisdiction to ask its help to enable him to
seize upon property to which he has no conscionable right, and
from which he would have been completely shut out had it
not been for the negligence of the Auditor. These circum-
stances give to the claim of the appellee a very suspicious
appearance ; too much so, indeed, to permit a chancellor to
move in the execution of a claim so stale, and this the more
so, as there has been no attempt to account for this unreason-
able delay.

> The decree of the Orphans' Court is now reversed
> and set aside at the costs of the appellee, and
> the original report of the Auditor is now con-
> firmed. The appeal of the German Roman
> Catholic St. Vincent's Orphans' Asylum of
> Philadelphia and vicinity is quashed.