[Sac. No. 1612. In Bank.—November 23, 1909.]

ELIZABETH MILLER et al., Appellants, v. W. H. ASH et al., as Executor, etc. of William Ash, Deceased, Respondents.

GUARDIAN AND WARD—CONVERSION OF FUND BELONGING TO TWO WARDS —SEPARATE CLAIMS AGAINST GUARDIAN.—Where the guardian of two minor wards converts to his own use a fund, a respective half of which belonged to each of the wards in severalty, each of them

acquires a separate claim against the guardian for his portion of the fund so converted.

ID.—DEATH OF GUARDIAN—CLAIM AGAINST ESTATE.—After the death of the guardian, the presentation of a claim against his estate for the money so converted, in which the claimants designated themselves as "joint claimants," but which otherwise contained a true statement of their ownership of the fund, did not have the effect to make their claim against the guardian joint instead of several.

ID.—RECEIPT OF FUND BY GUARDIAN—SINGLE ACT OF CONVERSION.—The fact that the guardian received the fund as a gross amount in settlement of claims in favor of his wards as legatees under a will, without segregation of the amounts severally due them, and commingled the entire fund with moneys of his own, did not make their claim against the guardian joint instead of several.

ID.—DEATH OF WARD—PERSONAL REPRESENTATIVE MUST ENFORCE CLAIM.—Upon the death of a ward, his personal representative, and not his heirs, alone can sue the guardian or his estate to recover property belonging to the ward.

ID.—LACHES—STATUTE OF LIMITATIONS.—The solution of questions arising by reason of the plea of the statute of limitations or of laches, in cases where a long period of time has intervened since the origin of the cause of action, depends upon the circumstances peculiar to each particular case.

ID.—ACTUAL AND CONSTRUCTIVE FRAUD.—In the application of the doctrine of laches, a distinction is made between cases of constructive fraud and those where actual fraud is charged, and greater liberality in respect to lapse of time in the latter class is allowed than in the former.

ID.—PLEADING—INFORMATION OR KNOWLEDGE PUTTING ON INQUIRY—CONSTRUCTIVE NOTICE.—In cases where actual malversation is imputed and directly charged in the complaint, if the plaintiff seeking to avoid the operation of the statute of limitations or to excuse the delay which would, in the absence of a sufficient excuse, amount to such laches as would defeat his right of action, possessed information or knowledge of extraneous facts or circumstances, which, although not directly tending to show the existence of a prior conflicting right, are sufficient to put him, as a prudent person, upon inquiry, he is then charged with constructive notice of all that he might have learned by an inquiry prosecuted with reasonable diligence.

ID.—PROSECUTION OF DUE INQUIRY.—In every such case, the first question is whether the facts of which the party has information are sufficient to put him upon inquiry, so as to raise the *prima facie* presumption that he has obtained information of what he might have learned, and the further question is then presented, whether he has made a due inquiry without discovering the truth.

ID.—CONVERSION OF FUND BY GUARDIAN—DELAY OF FORTY-FIVE YEARS—LACHES NOT SHOWN.—In this action, which was one against the
CLVI Cal.—35

estate of a guardian to recover property of his wards converted by the guardian more than forty-five years prior to the commencement of the action, it is held, that the complaint disclosed no such extraneous facts or circumstances in existence during the minority of the wards or within a reasonable time thereafter, connected with the guardianship transaction complained of, as would put the wards, as prudent persons, upon any inquiry as to such transaction, so that their failure to make inquiry was a bar to the right to maintain the action.

ID.—SPECIAL CIRCUMSTANCES EXCUSING DELAY.—In such action, it is only where special circumstances are made to appear, calling for the relief demanded, that the courts are justified in excusing so long a period of delay in asserting the right, and in proceeding to adjust the differences between the parties.

ID.—FAILURE OF GUARDIAN TO ACCOUNT—CONCEALMENT OF RECEIPT OF FUND.—In the present case, among the circumstances excusing the delay and justifying the relief demanded against the estate of the guardian are the facts that the guardian failed, for upwards of forty-four years, to file his final account, appraisement, and report of his guardianship, and that when he did file such papers, none of them disclosed the fact of the receipt by him of the fund sued for, and that during such period neither of the wards had knowledge of the receipt by him of the fund, or of circumstances putting them on inquiry.

ID.—REPUDIATION OF TRUST BY GUARDIAN.—The intentional or fraudulent concealment from the wards by the guardian of money or property of which they had no knowledge and which they had no reason to know belonged to them cannot be treated as a repudiation of his trust by the guardian, in the sense that the wards would thereby be barred by the statute of limitations from maintaining an action for the same within the statutory period after their discovery that the guardian did receive it.

ID.—ACTION AGAINST ESTATE OF GUARDIAN—CLAIM FOR MONEY CONVERTED—PRIOR ACTION FOR ACCOUNTING UNNECESSARY.—It is not essential to the maintenance of a suit to establish a claim existing against a guardian in favor of the ward, for money belonging to the ward which had been converted by the guardian, which is commenced after the death of the guardian against his estate, that a prior action for an accounting against his personal representatives should have been brought, in which the claim had been established.

APPEAL from a judgment of the Superior Court of Colusa County. H. M. Albery, Judge.

The facts are stated in the opinion of the court.

S. W. McCaslin, and C. E. McLaughlin, for Appellants.

Thomas Rutledge, and W. H. Carlin, for Respondents.

MELVIN, J.—This case was decided by the district court of appeal and afterward an order for a rehearing was duly granted by this court. The suit was against the executor and executrix of the estate of W. H. Ash, the plaintiffs being Elizabeth Miller, and the three sons and sole heirs of her deceased brother Robert Read. The complaint very fully set forth the appointment of Ash as guardian of the persons and estates of Mrs. Miller (formerly Read) and her brother Robert; the payment to Ash, by permission of the probate court, of a sum of money in compromise of claims against the estate of one Reynolds, based upon legacies left to Ash's two wards by one of Reynolds's purported wills; the concealment by Ash of the existence of the interests of his wards in Reynolds's estate and of his collection of money in satisfaction of their claims; the filing of his account after many years wherein he falsely asserted that he had received nothing as guardian for the benefit of either ward; their subsequent discovery of his fraud practiced upon them; and many other matters which will more fully appear in the opinion of the district court of appeal.

The demurrer of defendants to the complaint was sustained and upon the refusal of plaintiffs to amend, judgment against them was rendered accordingly. The district court of appeal affirmed the judgment of the lower court as to the three heirs of Robert Read but overruled it as to Mrs. Miller, holding on the authority of *Grattan* v. *Wiggins,* 23 Cal. 16, and *Robertson* v. *Burrell,* 110 Cal. 579, [42 Pac. 1086], that the action should have been prosecuted for the benefit of the heirs of Robert Read by the administrator of his estate.

In the petition for hearing in this court and in the briefs filed our attention has been particularly called to the rule that all persons interested in a trust must be made parties to a suit against the trustee. It is contended that this action should have been prosecuted by Mrs. Miller, by the administrator of the estate of her deceased brother Robert Read, and by the three sons of the latter, all as joint plaintiffs, but that no claim having been presented against Ash's estate by the administrator of the estate of Robert Read, deceased, there can be no recovery on the part of any one. It is not necessary here to

determine whether or not in the matter of a trust in which Mrs. Miller and the heirs of Robert Read were the *joint* beneficiaries, it would be necessary to join said heirs of Read with their aunt Mrs. Miller and the administrator of their father's estate in bringing a suit against the trustee. When we consider the fact that each ward of William Ash had a *several* claim, some of the seeming difficulties of the situation disappear. Mrs. Miller, according to the allegations of the complaint, had a distinct, individual claim against the estate of her deceased guardian which existed just as independently and separately as if the other ward had been a stranger and not her brother. It is true that these plaintiffs when they presented their claim against Ash designated themselves as "joint claimants." It is also true that attached as an exhibit to this claim is a full statement of the facts regarding Ash's receipt of the four thousand dollars in compromise of the claims of his wards against the estate of Reynolds. This indicates that there was in reality no joint interest but that Ash had mingled and appropriated money belonging to both estates. His combining of these funds did not make the wards joint owners, nor did his settlement in gross of their claims against Reynolds's estate without segregation of the amounts severally due his wards deprive Mrs. Miller of the right to demand her property. If Mrs. Miller had wished to make a separate claim against the estate of Ash without joining her nephews, she could have done only that which was done. She could have merely stated in her claim the circumstances which gave her an interest in that estate. She was not even required to assert the proportion of the fund to which she was entitled. That was a fact to be determined by the probate court because Ash had put it out of her power to calculate just what proportion of the fund received from Reynolds's estate belonged to her. The difficulty of making this calculation was due to a situation of Ash's own creation and his representatives cannot therefore complain because Mrs. Miller's claim failed to specify some particular share of the four thousand dollars and interest due her. The failure to segregate the funds belonging respectively to Mrs. Miller and her brother was due to the *mala fides* of Ash. The difficulty, if any there be, resulted from Ash's own act. The claim as presented, therefore, contained all the necessary information

respecting Mrs. Miller's interest in the Ash estate. Such claim was the proper basis, after its rejection, of a suit by Mrs. Miller against Ash's executor and executrix. While the decision of the district court of appeal will leave some of the complaint as surplusage so far as Mrs. Miller's cause of action is concerned, that does not alter the fact that a cause of action is stated in her behalf. The opinion of the district court of appeal, which we hereby adopt, is as follows:—

The court below sustained the demurrer to the complaint, and leave to amend having been denied, judgment was entered in favor of the respondents.

This appeal is by the plaintiffs from said judgment.

The action is founded on an alleged claim of plaintiffs against the estate of William Ash, deceased, defendant's testator, for the sum of sixteen thousand dollars, said amount representing the principal, amounting to four thousand dollars, and the interest accruing thereupon, at the rate of seven per cent per annum from the thirteenth day of February, 1863, to the time of the filing of the complaint herein on April 18, 1907. Said claim was, on the fifteenth day of February, 1907, presented to the defendants, as the executor and executrix, respectively, of said estate, for allowance, and the same rejected by said executor and executrix on the eighteenth day of February, 1907.

The claim has its origin in a transaction occurring over forty-four years prior to the institution of this suit, and is founded upon the alleged fact that, as guardian of the persons and estates of the plaintiff, Elizabeth Miller, and her brother, Robert Read, now deceased (father of the other plaintiffs), the testator of the defendants in the month of February, 1862, received into his hands for his wards the sum of four thousand dollars, of which, as such guardian, or otherwise, it is charged, he never made or rendered any account.

The history of this venerable transaction is minutely recounted in the complaint, from the averments of which, in order that an intelligent understanding of the legal points submitted for solution may be had, it becomes necessary to extract and present the following comprehensive statement of the facts:—

In the year 1855, one Joseph Read died intestate at Marysville, in the county of Yuba, California, leaving surviving

him a wife, Catherine Read, and two minor children, Elizabeth Read (now Elizabeth Miller, one of the plaintiffs herein), and Robert Read, a son; that said minors were the issue of the intermarriage of said Joseph Read and Catherine Read; that on the third day of May, 1859, Catherine Read married William Ash, the testator of the defendants, and remained said Ash's wife until the time of her death, which occurred on the seventh day of February, 1861; that on the second day of July, 1862, after proceedings duly had, said William Ash was appointed by the probate court of said Yuba County guardian of the persons and estates of said Elizabeth Miller, then Elizabeth Read, and the said Robert Read, and on said day said Ash qualified as such guardian; that at said time Elizabeth Miller was a minor of the age of fourteen years and her brother, Robert Read, was a minor of the age of twelve years; that said guardian never filed an inventory or appraisement of the estate of either of his said wards "and no such inventory or appraisement has ever been filed in the matter of the guardianship of either of said minors, save and except that on the 21st day of March, 1906, said William Ash, as such guardian, made and caused to be filed an inventory, a copy of which is hereto annexed"; that said Ash never filed an account or a report as such guardian until the twenty-first day of March, 1906, when he caused to be filed in said guardianship proceedings his final account (made a part of the complaint), and further caused to be filed his report as such guardian, the same being made a part of the complaint; that there were never filed or in any way exhibited by said guardian in the guardianship proceedings any "paper, or data or statement from which the said wards or either of them or any person interested could ascertain what property, either real or personal, ever came into the hands or possession of said guardian, and the only source from which any information touching said property could be obtained was the petition of said William Ash for letters of guardianship," a copy of which is attached to and made a part of the complaint; "that the said minors, and each of them, both during their minority and after obtaining their majority had no knowledge of any property which might or could possibly be a part of the estate to which they were entitled save and except that they were informed by persons other than their

said guardian that both their mother, the said Catherine Read,
and their father, the said Joseph Read, had left property con-
sisting of real property and horses, wagons, mules and other
personal property exclusive of money, and they, and each
of them, upon obtaining such information repeatedly re-
quested and importuned said William Ash as their said guard-
ian to render an account and turn over to them the property
which had come into his hands, particularly that which had
come into his hands from the estates of their parents, Cather-
ine Read and Joseph Read aforementioned. That at all times
during his lifetime the said William Ash represented to his
said wards and to each of them, and to said plaintiffs and
to each of them, that he had never at any time or from any
source received any property of any kind or nature belonging
to the estate of his said wards, and denied that as such guard-
ian he had ever received any property of any kind or nature
belonging to his said wards or either of them, or to the estate
of either of them"; that Ash had always represented to his
wards that all the property of the estates of their parents
had passed into the hands of and been used by an uncle of
said minors, Robert Read by name, and that "he had never
received any money or property whatever from any source
whatever, as guardian of the persons and estates of said
minors or either of them"; that neither of the plaintiffs
"knew or had any reason to believe, nor had they or either
of them any knowledge, or information or reason to believe
that said guardian had received any money or property from
any source other than from the estates of said Catherine Read
and Joseph Read, parents of said minors, until the month
of August, 1906, when said male plaintiffs . . . received in-
formation that such was the fact," which said information
was, in the year 1907, for the first time, given to the plaintiff,
Elizabeth Miller, by said other plaintiffs. The complaint
proceeds to allege that on or about the thirty-first day of
December, 1861, one Richard J. Reynolds made a will in
which he gave and bequeathed to the plaintiff Miller, then
Read, the sum of ten thousand dollars and "other property,"
and to her brother, the said minor, Robert Read, the sum
of one thousand dollars and "other property"; that subse-
quently to the execution of said will, said Reynolds made
another will, dated the twenty-seventh day of February,

1862, by the terms of which all his property was given, devised, and bequeathed to his brothers, Charles H. Reynolds and George A. Reynolds, and his sister, Lucy A. Cole; that after making the last mentioned will said Richard J. Reynolds died; that in the month of October, 1862, the said William Ash, as guardian of said minors, caused the first mentioned will to be filed for probate in the probate court of Yuba County, and the said G. A. and Charles A. Reynolds filed for probate in said probate court the said will executed by Richard J. on the twenty-seventh day of February, 1862, "and thereupon a contest arose in said court involving the validity and effectiveness of said wills of Richard J. Reynolds, deceased"; that on the ninth day of February, 1862 (1863?), said Ash as guardian of said minors petitioned the said probate court of Yuba County for and was granted leave by said court to compromise and settle the claims of his said wards against the estate of said Richard J. Reynolds, deceased, for the sum of four thousand dollars; that on the thirteenth day of February, 1863, said Ash compromised and settled said claims of said minors against said Reynolds's estate for the said sum of four thousand dollars, executing an instrument acknowledging the receipt, as such guardian, for and on behalf of his wards, of said sum, the same being, in the language of said receipt, "in full and entire payment and satisfaction of all claim, right, interest or interests, legacy and devise, which the said Elizabeth Read and Robert K. Read or either of them have in, or to or against the estate of the said R. J. Reynolds, deceased." It is alleged that all the proceedings relating to said compromise and settlement were had in said probate court in the matter of the estate of R. J. Reynolds, deceased, and that no proceedings of any kind appertaining to or connected with said settlement and compromise of the claim of the said minors against said Reynolds's estate were had in said court in the matter of the guardianship of said minors; that "no petition, order, receipt, return or paper of any kind relating to said compromise or to the estate of R. J. Reynolds, deceased, was ever at any time filed by said William Ash or any person whatever, in said guardianship proceedings"; that there never was any record in said guardianship proceedings from which "said wards or plaintiffs or any person could ascertain or know, or believe that said wards had

any interest in or claim against the estate of R. J. Reynolds, deceased." It is further averred that Reynolds was not kin to or relative of said minors, and that there was no reason which would cause them to know or even suspect that they or either of them would be or had been named in the will of said Reynolds as legatees or devisees; that said minors did not know that they had been so named in said will, and that neither of them "had any knowledge, belief or suspicion that the aforesaid compromise or settlement had been made or attempted or that said William Ash had received any money or property of any kind or nature either as guardian or otherwise from the said estate of Richard J. Reynolds, deceased," until on or about the fifteenth day of January, 1907, when the plaintiffs, the Reads, were informed of the fact by one L. B. Ayer, who, having theretofore examined the papers in the matter of the estate of said Richard J. Reynolds, deceased, discovered the receipt before mentioned as having been given by said Ash in full satisfaction of the claim of said minors against said estate of Reynolds; "that said L. B. Ayer, at the time he so discovered said receipt was not acting for or on behalf of said plaintiffs or either of them, but was acting for himself alone in looking over the papers in the matter of the estate of Richard J. Reynolds, deceased, and that the conduct of said L. B. Ayer at the time of such discovery was not prompted by or at the instance, request or suggestion of either of said minors or of said plaintiffs." It is charged that "said William Ash in his lifetime concealed the fact that he had received said four thousand dollars from said minors and each of them and from said plaintiffs and each of them," and represented to said minors that he had never received any money or property whatever as their guardian; that said minors never knew or suspected that "he was concealing the fact that he had received the sum of four thousand dollars or any sum whatever as such guardian, or that his said representations were false and fraudulent and made with intent to deceive and defraud said minors," until receiving information thereof under the circumstances before indicated.

The complaint further states that Robert Read, one of the wards of said William Ash, deceased, died intestate at Vancouver, British Columbia, on or about the tenth day of Octo-

ber, 1905, leaving surviving him the plaintiffs, Roy R. Read, Leonard B. Read and Egbert B. Read, "his sons and sole heirs at law"; that said William Ash died testate in Colusa County, this state, on or about the first day of August, 1906, and in his last will and testament named the respondents herein the executor and executrix, respectively, thereof; that said will was proved and admitted to probate and that letters testamentary were issued to the defendants, who in due time qualified and entered upon the discharge of their duties as such executor and executrix.

The petition of William Ash to be appointed the guardian of the persons and estates of said minors is dated June 30, 1862, and declares, among other matters, that by reason of the death of their parents, they "became and are legally entitled to real estate situated within the county of about the value of six thousand dollars. Also, personal estate of about the value of three thousand dollars, all of which needs the care and attention of some fit and proper person"; that each of said minors was then over the age of fourteen years, "and as appears by the written nomination herewith filed has nominated your petitioner as guardian, subject to the approval of your honor."

On March 21, 1906, as has already been seen from the averments of the complaint, said Ash, as guardian, etc., filed his final account in said guardianship matter, together with an inventory and a report of his administration of the affairs of the estates of said minors.

The inventory shows that no estate, property, or money belonging to said minors or either of them ever came into the possession or custody or control of said guardian during the period of his said guardianship.

The final account makes the same showing, but in addition it appears therefrom that said guardian, while so acting, expended, in the support and education of his wards, the sum of five hundred dollars each, or a total of one thousand dollars.

The report alleges that the only property belonging to said minors was an interest in the estate of their father, Joseph K. Read, said estate, during the lifetime of the latter, consisting of property which was owned in common and as partnership assets by said Joseph K. Read and his brother, Robert Read; that Catherine Read, widow of Joseph Read, in the year 1856, (three years prior to the intermarriage of said Catherine and

said Ash) was duly appointed administratrix of the estate
of said Joseph, duly qualified as such, and letters of admin-
istration regularly issued to her; that said estate was never
settled or closed, and distribution thereof never made, and
that said Ash, as guardian, "did not, and never has received
or had, nor did there come into his possession by distribution,
or otherwise, any portion of the said estate of said Joseph K.
Read"; that no administration was ever had upon the estate
of said Catherine and that "no property, money, or estate was
ever received or came into the possession of said petitioner
(Ash) as such guardian, belonging to the said estate of said
Catherine Ash, aforesaid." The report then states that on
or about the ninth day of August, 1866, after the plaintiff, Mil-
ler, reached the age of majority, Ash executed and delivered
to her a quitclaim deed of all interest in the estate of both
her mother and father, and of all his interest in any property
in the city of Marysville, where, the report alleges, all the
property owned by said Joseph K. and Catherine Read Ash
was situated during their lifetimes, and that said Miller,. "on
reaching the age of majority, took possession of and received
all the estate and property belonging to said Catherine Ash,
and thereafter sold and disposed of all the same in her own
name and right"; that, "after the arrival of said wards at
the age of majority, no account or settlement was ever had,
for the reason that it was fully understood and agreed by
each of said wards, that no property belonging to said wards
had ever come to the hands of said guardian, and that said
wards were indebted to said petitioner as aforesaid." The
report states that Robert Read, after said wards had reached
legal age, conveyed to them all interest of their said father
in the property held in common by him and said Robert;
that, although said wards resided, up to the time of said
Robert's death, near and within the jurisdiction of the court
in which the administration of the guardianship proceedings
was pending, they never asked for or demanded or claimed
any "further settlement or accounting, but said guardianship
was, during all of said times, since said wards reached the
age of majority, deemed by them and considered by all par-
ties as fully settled and closed without further account."

The demurrer, among other grounds of objection to the
complaint, introduces the statute of limitations (Code Civ.

Proc., secs. 339, subd. 1, 338, subd. 4 and 443) and laches in bar of plaintiff's cause of action.

It is also urged, through the demurrer, that the plaintiffs, Roy R. Read, Leonard B. Read, and Egbert B. Read, are not proper parties to this action, for the reason that said action is for money alleged to be due the estate of Robert Read, the father of said plaintiffs, and, it appearing from the complaint that said Robert Read is dead, that his legal representatives alone can sue and not the heirs. (*Grattan* v. *Wiggins,* 23 Cal. 16; *Robertson* v. *Burrell,* 110 Cal. 574, [42 Pac. 1086], and cases therein cited.) This contention must be sustained. In the last mentioned case it is said: "Plaintiffs are not the proper parties to maintain this action, and they have no legal capacity to do so. While, in a sense, they are beneficiaries of the trust which resulted by the death of their father, the fulfillment of which was imposed upon the surviving partner, yet there were certain intermediate steps and processes necessary to be taken and followed before their beneficial interests could be reduced to possession. . . . For there was another trust intervening in time and right and duties between the close of the surviving partners' trust and their enjoyment of its fruits. It is true that as heirs of their father the title to his property, real or personal, vested in them, but their title did not carry with it the right of immediate enjoyment. The rights and duties of the administrator of their father's estate interposed and intervened. . . . The heirs' title is subject to the performance by the administrator of all his trusts, and they finally come into the possession and enjoyment of only such portion of the estate as may remain after the execution of them by the administrator."

We have given careful attention to all the authorities cited by the respondents in which the statute of limitations and laches constitute the principal theme of discussion and the pivotal questions, and, while those cases aptly and clearly illustrate the application of the principles governing the determination of the questions involved in such defenses, yet they are of but little aid, except in a general way, in the solution of the same propositions here, since these must be measured by circumstances materially different from those found in the cases referred to. It is obvious that the courts, in dealing with a particular set of facts and circumstances in

cases in which those questions arise, can do little more than to so apply the principles governing such determination as to reach a satisfactory conclusion in the particular case under review. In other words, the solution of the questions arising by reason of the plea of the statute of limitations or of laches, in cases where a long period of time has intervened between the origin of the cause and the institution of an action thereon, must necessarily hinge and depend upon the circumstances peculiar to each particular case, and each case in which such questions are appropriately raised, and which constitute the principal subject of discussion therein, becomes, therefore, largely a law unto itself. Those general rules, however, as suggested, enable the courts to successfully test the circumstances of each case and thus arrive at a final decision in conformity either with the demands of actual justice, on the one hand, or with the policy of all rational systems of jurisprudence, on the other; for it may be and no doubt is true that in many cases, real justice may be thwarted by upholding the defense of the statute or of laches, in which case the principle intervenes that the revivification of stale demands, difficult to prove, and if proved at all, by evidence of a doubtful and dubious character and origin, should not be encouraged or entertained for the sake of the peace and repose of society. In other words, the lapse of a few years may be sufficient to defeat the action in one case, while a longer period may be held requisite in another, dependent upon the circumstances, such as the situation of the parties, the extent of their knowledge, means of information, whether the case is one of constructive or actual fraud and the like. (*Hammond* v. *Hopkins*, 143 U. S. 250, [12 Sup. Ct. 418], and cases therein cited.) In that case a distinction is also made, in the matter of the application of the doctrine of laches, between cases of constructive fraud and those where actual fraud is charged, and it is there declared that greater liberality in respect of lapse of time in the latter class is allowed than in the former. Here, it is to be remembered, actual malversation is imputed and directly charged in the complaint. It is one of the settled general rules in this class of cases that if the party seeking to avoid the operation of the statute of limitations or to excuse the delay which would, in the absence of a sufficient excuse, amount to such laches as would defeat his right of

action, possessed information or knowledge of extraneous facts and circumstances, or, in other words, of matters *in pais,* which, although not directly tending to show the existence of a prior conflicting right, are sufficient to put him, as a prudent person, upon inquiry, he is then charged with constructive notice of all that he might have learned by an inquiry prosecuted with reasonable diligence. (Pomeroy's Equity Jurisprudence, sec. 610.) It is said by the same author that from the existence of such circumstances "the legal presumption arises that he *has* obtained information of what he might thus have learned. In every such case the first question is, whether the facts of which the party has information *are* sufficient to put him upon an inquiry, so as to raise the *prima facie* presumption; the further question is then presented, whether he has made a due inquiry without discovering the truth, so as to overcome the presumption and defeat the notice, or whether he has so neglected this duty that the presumption remains unshaken and the notice effective."

The important question, arising in this case upon the facts as stated in the complaint, and upon the solution of which the decision must depend, is that of laches, and may thus be stated: Were there such extraneous facts and circumstances in existence during their minority or within a reasonable time thereafter connected with the guardianship transaction as would put the plaintiff Miller and her brother, as prudent persons, upon any inquiry as to the specific claim against their guardian founded upon the bequest to them contemplated by Reynolds in his first will, so that their failure to inquire must be held to be a fatal neglect?

We may as well say, *in limine,* that we think the complaint presents sufficient facts to warrant an investigation, upon a trial of the issues of fact, of the transaction complained of, so far as it interests the plaintiff, Mrs. Miller; for we are unable to perceive anything in the circumstances, as they are disclosed by the complaint, from which we would be justified in declaring that the wards were in possession of sufficient information as to the particular claim in dispute to put them, as prudent persons, upon inquiry concerning said claim. The allegation that the wards without success repeatedly importuned their guardian to render to them or to the court an account of his administration of their estates

shows that they had in mind the property which they sup-
posed belonged to them as heirs of their parents. It does
not appear when the guardian was so importuned—whether
before or after the wards reached their majority. But if it
may be argued from the fact that they so requested an ac-
counting that they must have suspected an intention of wrong-
doing on the part of the guardian in the matter of the man-
agement of their estates, or believed that he was fraudulently
seeking to withhold or conceal any portion thereof from
them, and it was, therefore, their duty to have then put on
foot and prosecuted a proper inquiry looking to a determina-
tion of the proposition, by which, in all likelihood, they could
have developed the full extent of his remissness or fraud,
thus bringing to light the fact of the receipt by him of the
money in question, the answer is, we think, in the declaration
of the complaint that the guardian had always and repeatedly
assured his wards that no property belonging to them ever
came into his possession, and that they reposed full confidence
and belief in his representations; that the wards had neither
a belief nor even a suspicion, nor any reason upon which to
found such a belief or a suspicion, that they were to be or
were made beneficiaries under the first or any will of Rey-
nolds.

In the foregoing announcement of our conclusion, we are
not forgetful of the rule, so often applied in cases of this
character, where relief has been denied because of long delay
in asking it, and where circumstances, arising by reason of
such delay, have intervened or appeared to clearly warrant
the refusal by the courts to aid the derelict party, that "noth-
ing can call a court of chancery into activity but conscience,
good faith, and *reasonable diligence,* and that where these are
wanting the court is passive, and does nothing." (Chief Jus-
tice Taney, in *McKnight* v. *Taylor,* 1 How. 161, citing *Piatt*
v. *Vattier,* 9 Pet. 416. See, also, *Gress' Appeal,* 14 Pa. St. 463;
*Appeal of . . . Catholic St. Vincent's Orphans' Asylum,* 115
Pa. St. 157, [10 Atl. 37].)

The decision of the case here, it may frankly be admitted,
has not been altogether exempt from difficulty. The courts
hesitate, upon considerations of a necessary and well-founded
policy, to entertain and thus undertake to settle litigation
which, in the natural order of events, should have been set-

tled so long before its resuscitation that it had faded entirely from the memory of those even directly interested in it. And, as we have seen, it is only where special circumstances are made to appear, calling for the relief demanded, that the courts are justified in excusing a long period of delay in asserting the right and so proceed to adjust the differences between the contending parties. We think the complaint here shows circumstances which would render the denial of relief a denial of justice, assuming, of course, for the purposes of this decision, that the facts as pleaded can be proved by the degree of proof required in such cases. One of the significant and controlling circumstances impelling our conclusion that the judgment should be reversed, so far as the plaintiff Miller is affected, is the fact that Ash never filed a final account or asked to be discharged of his trust until a few months prior to his death—as late as March, 1906—when, for the first time he filed his final account, appraisement, and a report of his stewardship as guardian, and that in said final account, appraisement, and report is not to be found a single word referring to the money which, according to the receipt executed and filed by him in the matter of the estate of Reynolds, came into his hands as guardian of the estates of his wards.

While, in most of the cases like the present one, where the aid of the courts is asked after the lapse of many years after the right has accrued, the fact that such aid is demanded for the first time after the death of the party charged with the default, when explanation from his own lips is impossible, furnishes the foundation for a forceful and sometimes persuasive argument under certain circumstances, yet in this case the answer to such argument may be suggested in the query: Why did not Ash avail himself of the opportunity of which he was himself the voluntary author—an opportunity which he took occasion to create at a time when life to him (for presumably he was then a man well advanced in years) had run its course, or at best its end was not then far distant— to explain so important a transaction appertaining to the trust with which he had been invested? Having thus been silent when he could have spoken, had he desired to, upon a matter of such magnitude connected with his trust, the guardian, by his own unpardonable delay, occasioned, it appears from the complaint, through the want of good faith in deal-

ing with his wards as to their rights, has answered the claim
that great inconvenience and perhaps injustice may be caused
by the maintenance of an action instituted after the death of
the only person who could offer any explanation of the dis-
position of the money concerned in this dispute.

The complaint, it has been seen, declares that the wards
were in no way related to Reynolds, and that therefore they
never expected any bounty or benefaction from him or his
estate; that Ash always and persistently told them that no
property belonging to them ever came into his possession
as their guardian other than that which belonged to them
as heirs of their parents. They had a right to and most
naturally under the circumstances they would repose full
confidence in him and his representations. He not only stood
as to them *in loco parentis,* by reason of his rôle as guardian,
but he was, it must be kept in mind, their step-father, having
been married to their mother when they were in fact mere
infants. The complaint does not disclose any extraneous cir-
cumstances concerning the Reynolds bequest which would
have put the wards, as prudent persons upon their inquiry,
either before or after they attained their majority, unless it
can be said that, because the transaction in the Reynolds
matter constituted a public court record the wards should
have known of it. But the complaint asserts that they, as a
matter of fact, did not know anything about the bequest, nor
the compromise thereof effected by the guardian, and it is
irresistibly inferable from the fact of the institution of this
suit so late as the year 1907 that the complaint states the
truth, for is it reasonable to suppose that the wards, knowing
or even suspecting that their guardian had in his possession
so large a sum of money to which they were entitled, would
have neglected to assert their just claim thereto, or remain
inert and supine as to so important a right so as to permit
it to vanish through the erosive influence of long delay?
There is, in our judgment, no escape from the conclusion that
the plaintiff Miller knew nothing and had no reason to know
anything of the money received by Ash for herself and brother
from the estate of Reynolds until about the time Ash filed
his final account and report in 1906.

By whom has the memory of this ancient transaction been
first revived, and why resuscitated by the guardian himself

at a time so remote from that at which it should have been finally and conclusively settled? It was, manifestly, Ash's own inexcusable neglect and delay which brought back to life a transaction which, if properly attended to, should have been, long ago, to use the language of one of the cited cases, "confirmed and laid aside with past things, to be forever forgotten." But, for at least thirty-five years, he permitted himself to remain undischarged of his trust and, so far as the complaint shows, passed to the beyond without having been so discharged, and filing no final account and making no final report until, as we have seen, only a few months prior to his death, and then, as stated, giving absolutely no information and attempting no explanation of what disposition had been made of the large amount of money which he is shown to have received for his wards during his administration of their estates.

Filed with and presented to the court, as they were just before his death, and when he must have been a very old man, the final account, appraisement, and report of this guardian's administration of the duties of his trust may almost be regarded in the light of a statement *in extremis* relating thereto, and his silence then upon the question of the disposition of the money involved in this controversy can certainly well be construed as an admission that he could not explain the transaction consistently with the principles of good conscience, good faith, and fair dealing in the discharge of his fiduciary duties. If he could, why did he not explain it? Can there be the slightest doubt, from the averments of the complaint, that he received the money? We see no reason why, in equity, good conscience, and justice, so far as the complaint discovers the facts, the plaintiff Miller should not be given the relief for which she asks, and if the respondents find themselves, unfortunately, in a position in which they may be unable to make a successful defense to the merits at the trial, the misfortune is only the consequence of the default, neglect, and want of good faith of their testator in the transactions leading to this litigation.

The question involving the alleged bar of the statute of limitations calls for no extended notice. The complaint asserts that the discovery of the right declared upon was made in the year 1906, and this allegation under the demurrer

must be taken as true, when supported by other sufficient statement of facts, as we have held and do hold is the case. It therefore follows that this action is not affected by the statute. The contention that the guardian repudiated his trust when he declared to the wards many years ago that he had no property in his possession as such guardian belonging to them is without merit. We have seen that when the wards demanded a settlement or an accounting of the guardianship assets they had reference to property which they believed had descended to or been acquired by them as heirs of their father and mother. We cannot understand how the intentional or, as the complaint charges, the fraudulent concealment from the wards by the guardian of money or property of which they had no knowledge and which they had no reason to know belonged to them could be treated as a repudiation of the trust in the sense that the wards would thereby be barred by the statute from maintaining an action for the same within the statutory period after the discovery that the guardian did receive money for them of which until then they had no knowledge and of the fact that he had fraudulently withheld it from them.

The defense of the statute of limitations or of laches is, of course, as legitimate and as impregnable a defense as may be set up, when urged under appropriate circumstances, and should unhesitatingly be sustained where it clearly appears that a party has, through his own supineness or listlessness, and not through any act of fraud of the party against whom the right subsists, permits either the statute to run so as to foreclose his rights to assert and maintain his claim in the courts, or has neglected to prosecute his right for so long a period as to indicate an abandonment thereof and circumstances have in the mean time arisen to bring his negligence clearly within the doctrine of laches. But neither the statute limiting the time within which actions may be brought, nor the equitable doctrine of laches, has been ingrafted into our system of laws for the sole benefit and special purposes of the individual who is privileged to invoke them. The probability of doing injustice in cases long delayed, or, perhaps, to speak more accurately, of not being able under such circumstances to do exact justice, demands the application of those principles in all proper cases for the peace and repose

of society. This, and not, as may by some be supposed, that the discharge of an honest debt or an honest obligation may thus be avoided, is the paramount idea underlying those rules; for the resurrection of rights of action, long deceased, or of stale demands, decomposed from age, so far as the availability of proof sustaining them is concerned, and their exploitation in the courts, tends to bring about disturbances, which it is the purpose of all law to prevent. Hence, though a defendant in such a case may suffer some discomfiture or inconvenience from the existence and proof of circumstances which will arrest the operation of the statute or destroy all ground for the successful interposition of the defense of laches, yet it cannot be said to result in a rude shock to society, more vitally concerned than the individual debtor, for the courts to entertain an action on a claim, however old it may be, where, as we think is clearly shown here, the pleaded or proven facts display circumstances showing that the long delay in prosecuting the same has been due solely to the neglect and default of and concealment, *ex industria,* of the naked truth, by the party upon whom the law has placed and who himself voluntarily sought the responsibility of discharging the duties of a sacred trust.

It is contended that the plaintiffs should have first brought an action for an accounting, and that the present action cannot be maintained because such a proceeding was not previously instituted and prosecuted to a final determination of the state of the account between the guardian and his wards. In certain cases involving property in the possession of a guardian or an executor as such, an action for an accounting is held to be a necessary prerequisite to the maintenance of an action, at law or in equity, to recover such property; but the circumstances of this case, we feel clear, bring it within certain exceptions to that rule. The death of the guardian before action was taken in this case precluded any hope of any practical advantage or benefit to be gained by either side through an accounting. It was the duty of the guardian, after the wards had attained their majority, to present his final account to the probate court for settlement. He could have been compelled to do so and required to render a full and detailed account of all his dealings with the property of his wards. He alone possessed the information con-

cerning the estates of his wards necessary to exhibit a correct account thereof. But, the guardian having died before making a settlement, and long after the wards reached their majority, his executors have no authority to present his account to a court of probate. (*In re Algier*, 65 Cal. 228, [3 Pac. 849].) Such want of authority is due to the fact that there is no law which gives the executors the right and the power to present the guardian's account to the court, but why the legislature has not given such authority to the executors is undoubtedly for the very obvious reason that such executors are possessed of no such information relative to the administration of the guardianship affairs as would insure the presentation of a correct or proper account. Hence, it follows, by the most cogent analogy, that in a case like this, where the suit to establish a claim existing against a guardian and in favor of his wards is commenced after the death of such guardian, an action for an accounting against his executors antecedently to a suit to recover upon the claim or establishing a trust in favor of the claimant in relation thereto, would not only be unnecessary, from a legal point of view, but would be altogether barren of satisfactory results.

Moreover, the property claimed here is in the form of money. It is, therefore, impossible that the "identical trust property or its product in a new form can be traced into the estate and so into the possession of the representatives." (*Lathrop* v. *Bampton*, 31 Cal. 29, [89 Am. Dec. 141]; *McGrath* v. *Carroll*, 110 Cal. 83, [42 Pac. 466].) It is further said in the case last cited that "a beneficiary who is unable to do this must rely on the personal liability of the trustee, and so relying has only a claim against the estate which must be duly presented for allowance. But such a claim is still based upon the trust, whatever that may have been. It has its origin in the trust, and depends for its validity upon the legality and sufficiency of the trust. The fact that the beneficiary is obliged to present his claim and look, like a general creditor, to the assets of the estate for payment, does not change the nature of his demand, which is still one for property due under a trust accounting; it merely changed his remedy." And so it is true in the case at bar. The claim here had its inception in the trust established by the creation of the guardianship, and must be sustained, if at all, upon

the legality and sufficiency of such trust. The fact that the plaintiffs obeyed the law requiring all claims against the estates of deceased persons to be presented for allowance to the executor or administrator before action thereon can be maintained in no way affects their right, even though it changes their remedy.

We have, as before stated, examined with minuteness all the authorities cited by both sides in this action, and, after a full consideration of the facts as presented by the complaint have, as already stated and as is obvious, concluded that, as to the plaintiff Miller, a cause of action is stated.

Upon the questions of laches and the statute of limitations I have consulted the following authorities in addition to those already noted: *Bangs* v. *Leveredge*, 60 Fed. 963; *Wood* v. *Carpenter*, 101 U. S. 140; *Stearns* v. *Page*, 7 How. 819; *Moore* v. *Greene*, 19 How. 69-72; *Martin, Assignee, etc.*, v. *Smith*, 1 Dill. 85, [Fed. Cas. No. 9164]; *Kennedy* v. *Breene*, 3 Myl. & K. 722; *McKown* v. *Whitmore*, 31 Me. 418; *Rouse* v. *Southard*, 39 Me. 404; *Boyd* v. *Boyd*, 27 Ind. 429; *Foster* v. *Mansfield, Coldwater, etc. R. R. Co.*, 146 U. S. 99, [13 Sup. Ct. 28]; *Bell* v. *Hudson*, 73 Cal. 288, [2 Am. St. Rep. 791, 14 Pac. 791]; *Porter* v. *Fillebrown*, 119 Cal. 236, [51 Pac. 322]; *Butler* v. *Hyland*, 89 Cal. 582, [26 Pac. 1108]; *Irwin* v. *Holbrook*, 26 Wash. 89, [66 Pac. 118]; *Hovey* v. *Bradbury*, 112 Cal. 626, [44 Pac. 1077]; Pomeroy's Equity Jurisprudence, secs. 886, 891, 895, 896; *Lataillade* v. *Orena*, 91 Cal. 576, [25 Am. St. Rep. 219, 27 Pac. 924]; Code Civ. Proc., sec. 338, subd. 4; Pomeroy's Equity Jurisprudence, secs. 1080-1083; *Taylor* v. *Taylor*, 136 Cal. 96, [68 Pac. 482]; *Hearst* v. *Pujol*, 44 Cal. 235; *Luco* v. *De Goro*, 91 Cal. 418, [27 Pac. 1082]; *Bank* v. *Enos*, 135 Cal. 169, [67 Pac. 52]; *Brown* v. *Campbell*, 100 Cal. 645, [38 Am. St. Rep. 314, 35 Pac. 433]; and *Barker* v. *Hurley*, 135 Cal. 28, [63 Pac. 1071, 64 Pac. 480]; *Seculovich* v. *Morton*, 101 Cal. 673, [40 Am. St. Rep. 106, 36 Pac. 387].

In accordance with the views herein expressed, the judgment as to the plaintiffs, Roy R. Read, Leonard B. Read, and Egbert B. Read is affirmed, and as to the plaintiff, Elizabeth Miller, the judgment is reversed.

Henshaw, J., Lorigan, J., and Shaw, J., concurred.

Rehearing denied.