NEWBERRY v. WILKINSON et al.

(Circuit Court of Appeals, Ninth Circuit. October 7, 1912.)

No. 2,102.

**1. COURTS (§ 259*)—JURISDICTION—FEDERAL COURTS—ADMINISTRATION OF ESTATES.**

Federal equity jurisdiction extends to the administration of decedents' estates, where it concerns citizens and residents of different states; but in the exercise of such jurisdiction the courts will be governed by the statutory rules and regulations of the states in which they are located with reference to the administration and settlement of such estates, since the general equity jurisdiction of the federal courts to administer the estates of deceased persons, as between citizens of different states, cannot be defeated or impaired by laws of the state undertaking to give its own courts exclusive jurisdiction.

[Ed. Note.—For other cases, see Courts, Cent. Dig. §§ 795, 796; Dec. Dig. § 259.*

Probate jurisdiction of federal courts, see note to Bedford Quarries Co. v. Thomlinson, 36 C. C. A. 276.]

**2. COURTS (§ 365*)—FEDERAL COURTS—JURISDICTION—STATE LAW—DECISION OF STATE COURTS—CONCLUSIVENESS.**

The equity jurisdiction of federal courts to administer the estates of deceased persons, as between citizens of different states, is concurrent with the probate jurisdiction of the state courts, and, being so, the orders and judgments of the probate courts in the due and orderly administration of such estates are conclusive and binding on the federal courts.

[Ed. Note.—For other cases, see Courts, Cent. Dig. § 950; Dec. Dig. § 365.*

Conclusiveness of judgment between federal and state courts, see notes to Kansas City, Ft. S. & M. R. Co. v. Morgan, 21 C. C. A. 478; Union & Planters' Bank of Memphis v. City of Memphis, 49 C. C. A. 468.]

**3. COURTS (§ 262*)—CHANCERY JURISDICTION—FRAUD—ACCOUNTING.**

A federal court of equity had jurisdiction of a suit by a nonresident against the administratrix, heirs, and sureties of a deceased guardian to compel an accounting, alleging that he had been deprived of his inheritance by the guardian's fraud.

[Ed. Note.—For other cases, see Courts, Cent. Dig. §§ 797, 798; Dec. Dig. § 262.*]

**4. GUARDIAN AND WARD (§ 174*)—LIABILITY ON BOND—RECEIPT OF WARD'S ESTATE—ESTOPPEL TO DENY.**

Decedent, having been appointed guardian of an estate of plaintiff and his sister, since deceased, executed a receipt to a referee in partition for the minors' share of the property sold therein, without having actually received the money, pursuant to a scheme by the minors' father to possess himself of the inheritance. *Held*, that the guardian's administrator and the sureties on the guardian's bond were estopped to deny that he received the money.

[Ed. Note.—For other cases, see Guardian and Ward, Cent. Dig. §§ 590-599; Dec. Dig. § 174.*]

**5. GUARDIAN AND WARD (§ 73*)—LIABILITIES OF DECEDENT—ENFORCEMENT AGAINST ADMINISTRATRIX AND HEIRS.**

Where a guardian's estate was insolvent, and insufficient to pay the expenses of administration, neither the administratrix nor the guardian's heirs, who received nothing from him, were liable for a devastavit committed in his capacity as guardian.

[Ed. Note.—For other cases, see Guardian and Ward, Cent. Dig. §§ 322-324; Dec. Dig. § 73.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

6. EXECUTORS AND ADMINISTRATORS (§ 225*)—"CLAIMS"—STATUTE OF NON-CLAIM—SCOPE.

Rem. & Bal. Code Wash. § 1470, provides for the publication of notice to creditors by every executor or administrator, and requires presentation of claims within a year of the date of the notice, and section 1472 declares that, if a claim is not presented within such time, it shall be barred. *Held*, that the word "claim," as so used, included the right of a ward, after he became of age, to recover against the estate of his deceased guardian for a devastavit, and that, in the absence of fraud or equitable considerations, his failure to present the claim to the administrator of the guardian's estate constituted a bar to his right to sue either the estate of the deceased guardian or his surety.

[Ed. Note.—For other cases, see Executors and Administrators, Cent. Dig. §§ 789–805; Dec. Dig. § 225.*

For other definitions, see Words and Phrases, vol. 2, pp. 1202–1211; vol. 8, p. 7604.]

7. GUARDIAN AND WARD (§ 182*) — DEVASTAVIT BY GUARDIAN — ACTION AGAINST SURETY.

Rem. & Bal. Code Wash. § 1432, provides that all actions against sureties shall be commenced within six years after the revocation or surrender of letters of administration or death of the principal, and section 1633 declares that section 1432 shall apply to bonds of guardians. *Held*, that where a guardian died January 25, 1904, and suit was not instituted against his estate and against his surety for an alleged devastavit until February 2, 1910, it was barred.

[Ed. Note.—For other cases, see Guardian and Ward, Cent. Dig. §§ 623–636, 638–663; Dec. Dig. § 182.*]

8. LIMITATION OF ACTIONS (§ 104*)—FRAUD—CONCEALMENT.

Where fraud, forming the basis of a suit in equity, has been willfully concealed from complainant until limitations have run, equity will disregard the statute in the interest of justice.

[Ed. Note.—For other cases, see Limitation of Actions, Cent. Dig. §§ 511–513; Dec. Dig. § 104.*]

9. EQUITY (§ 87*)—LIMITATIONS—LACHES.

Equity may cut short the limitations of the law, and will adopt its own limitations to meet the special and peculiar exigencies of the case.

[Ed. Note.—For other cases, see Equity, Cent. Dig. §§ 242–244; Dec. Dig. § 87.*]

10. EQUITY (§ 67*)—"LACHES"—WHAT CONSTITUTES.

In general, "laches" is neglect to do what in the law should have been done for an unreasonable or an unexplained length of time under circumstances permitting diligence.

[Ed. Note.—For other cases, see Equity, Cent. Dig. §§ 191–196; Dec. Dig. § 67.*

For other definitions, see Words and Phrases, vol. 5, pp. 3969–3972; vol. 8, p. 7700.]

11. GUARDIAN AND WARD (§ 182*)—ACTION ON GUARDIAN'S BOND—FRAUD—LACHES.

Decedent, having been appointed guardian of claimant and his sister to receive the proceeds of their share of certain real property belonging to his mother's estate, in a partition suit, receipted for such share without receiving the same, pursuant to a scheme to enable complainant's father to obtain the benefit thereof. The father lost the property, without any part of the proceeds ever coming into decedent's hands. Complainant became of age September 8, 1906. In 1904 he was informed of his interest in the property by his stepmother, who stated that, if he tried to recover the same, it would probably get his father into trouble. Complainant, though mentally capable of understanding the situation,

made no further inquiries until after October 30, 1909, when he caused the records to be searched, and brought suit against decedent's administratrix, heirs, and sureties on his bond as guardian February 2, 1910. Decedent's estate was insolvent when administered, and the suit was finally dismissed as to all the sureties except defendant M. *Held*, that complainant's claim against M. was barred by laches.

[Ed. Note.—For other cases, see Guardian and Ward, Cent. Dig. §§ 623–636, 638–663; Dec. Dig. § 182.*]

12. GUARDIAN AND WARD (§ 173*)—FRAUD OF GUARDIAN—PARTICIPATION BY SURETY.

Where complainant's guardian, by a fraudulent conspiracy with complainant's father, receipted for complainant's estate without actually receiving it, so that the father might obtain possession thereof, a surety on the guardian's bond was not bound to actively concern himself to see that the guardian accounted for complainant's estate, and his failure to do so was insufficient to charge the surety with participating in concealment of the fraud.

[Ed. Note.—For other cases, see Guardian and Ward, Cent. Dig. §§ 576–588; Dec. Dig. § 173.*]

Appeal from the Circuit Court of the United States for the Eastern Division of the Eastern District of Washington.

Action by William Fraser Newberry against Clara Wilkinson, as administratrix of the estate of B. C. Van Houten, deceased, and others. Judgment for defendants (190 Fed. 62), and complainant appeals. Affirmed.

The plaintiff, appellant here, was born September 8, 1885, and is the son of Arthur A. and Pauline B. Newberry. Pauline died intestate August 4, 1890. Her husband and son and a daughter survived her. At the time of her death she was the owner in community right with her husband of certain real property situated in the city of Spokane and vicinity. The children took an estate by inheritance in her community property. The entire property, including her husband's interest, was under mortgage. On January 29, 1891, Arthur A. Newberry applied to the superior court in and for the county of Spokane, state of Washington, for the appointment of a guardian for plaintiff and Laura Isabel, his sister, recommending B. C. Van Houten as a suitable person for the trust. Van Houten was accordingly appointed, and, by order of the court, gave a bond for the faithful discharge of his trust, and for rendering and paying all moneys, goods, and chattels which should come into his hands to such minors when they became entitled thereto, or to any subsequent guardian, should the court so direct, with the defendant J. Monaghan, and Lane C. Gilliam, W. H. Taylor, and J. F. McEwen, as sureties. The bond was approved and filed, and Van Houten took the oath of office as guardian.

On February 7, 1891, A. A. Newberry commenced a suit against Laura Isabel Newberry and William Fraser Newberry, B. C. Van Houten, guardian, and others, for partition of certain of the lands in which Pauline B. Newberry was possessed of a community interest with her husband at the time of her death. Van Houten, as guardian, filed an appearance in said suit, and subsequently answered, denying that he was possessed of any knowledge or information sufficient to form a belief as to the matters and things set forth in the complaint, and demanding strict proof thereof. The cause was referred for taking testimony. Upon the report of the referee it was found and declared by the court that it was impossible to make partition of the real property without great injury to the estate, and decreed that the property be sold for cash. A referee was designated to make such sale. The property was accordingly sold, J. F. McEwen becoming the purchaser of the several parcels, at the aggregate sum of $66,800, and the referee made report that he had paid to plaintiff one-half thereof, to wit, $33,400, and the remaining

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

one-half to B. C. Van Houten, general guardian and guardian ad litem of the said Laura Isabel and William Fraser Newberry, taking receipts therefor. The sale was confirmed on June 8, 1891, and it was ordered that, upon making the conveyance to the purchaser and receipt of the money therefor, said conveyance be presented to the court for approval. It was further ordered that the costs of the proceeding and an attorney's fee taxed at $1,000 be paid out of the proceeds of the sale, and the balance distributed, one-half to A. A. Newberry and one-half to B. C. Van Houten, guardian ad litem and guardian of the estate of said minor heirs. There were filed on the same day—June 8, 1891—the receipts of both Newberry and Van Houten, the receipt of Van Houten reading:

"Spokane, Wash., May 29, 1891.

"Received of B. E. Barinds, referee, for and on behalf of Laura Isabel Newberry and William Fraser Newberry, minors, $33,400, being one-half of the cash proceeds of the sale at public auction on the 29th day of May, 1891, of the following described property, in accordance with the decree entered by the superior court of the county of Spokane and state of Washington, on the 28th day of April, 1891" [describing the property].

"[Signed] B. C. Van Houten,

"Guardian of Estate of Said Minors, Laura Isabel Newberry and William Fraser Newberry."

The complaint in this suit filed sets up the fact of the death of Pauline B. Newberry, the names of her husband and heirs left surviving her, the subsequent decease of Laura Isabel while a minor, leaving plaintiff as the only heir, the appointment of B. C. Van Houten as guardian of the estate of plaintiff and his sister, the execution of the guardian's bond, the coming into possession and control of the guardian of the certain real property, the subsequent proceedings for partition in the superior court of Spokane county, Wash., the sale of the property to J. F. McEwen for the sum of $66,800, the execution by B. C. Van Houten to the referee of his receipt for $33,400, being for part of the proceeds of sale, that said sum of $33,400 came into the hands of Van Houten as guardian of plaintiff and his sister, that as such guardian he, the said Van Houten, has at all times failed, refused, and neglected to account for the proceeds of such sale, and, among other things, that the defendant Clara Wilkinson is the administratrix of B. C. Van Houten, deceased, and that she, the widow, and defendant Eugene Van Houten, a son, are his only heirs at law. Complainant further complains as follows:

"That at the time said B. C. Van Houten was appointed guardian of plaintiff's estate, and said sale above mentioned was made and said moneys received, plaintiff was of tender years, to wit, of the age of five years, and that he had no knowledge of said proceedings, and that he never was informed of the same, or of the fact that his said mother, Pauline B. Newberry, died possessed of any estate whatsoever, and that at no time did he know, or did he have any means of knowing, that he was entitled to any moneys as heir of the estate of his said mother, until on or about the 16th day of November, 1909, when for the first time he learned that his said mother died intestate, and left to the plaintiff and to his minor sister, Laura Isabel Newberry, the moneys and estate hereinbefore mentioned. That the first knowledge or intimation this plaintiff had that his said mother died possessed of the estate aforesaid was gained in the following manner, to wit: That on or about the 10th day of November, 1909, this plaintiff received a certain quitclaim deed to certain real estate situated in Spokane county, together with a letter from his said father, A. A. Newberry, requesting plaintiff to sign said quitclaim deed for the purpose of clearing the title to said lands therein mentioned, and that plaintiff was informed by said letter that said lands were a part or portion of the estate of his deceased mother, Pauline B. Newberry. That immediately upon receipt of said deed this plaintiff took the same to his legal advisers in Salt Lake City, Utah, who caused investigation to be made, and that plaintiff was for the first time informed of his rights by his attorneys herein on or about the 16th day of November, 1909. That shortly after plaintiff attained the age of 14 years he left said town and city of Spokane, Wash., and on or about the 15th day of April, 1901, enlisted in the

United States Navy at Brooklyn Navy Yard in the state of New York, and was thereafter continually in the United States naval service, and was at all times away from said town and city of Spokane during his said term of service in said navy. That plaintiff received his discharge on or about the 7th day of September, 1908, and shortly thereafter became a resident of Salt Lake City, Utah, and has at all times since said date resided in said state of Utah. That by reason of the facts hereinbefore alleged the plaintiff has lost his entire estate and inheritance from his said mother, and particularly said sum of $33,400, and that he is entitled to an accounting from the personal representatives of the estate of B. C. Van Houten, deceased, and to recover from said estate and the heirs thereof, and from said J. Monaghan as surety upon the bond of said B. C. Van Houten, said principal sum of $33,400, together with interest thereon at the legal rate from the 29th day of May, 1891. until paid, and for such other sum or sums as may be found due to he plaintiff herein upon an accounting being had in said estate."

The property sold under partition was at once conveyed by McEwen to A. A. Newberry, and by the latter mortgaged for an increased loan; it having been under mortgage at the time of the partition. Later the entire property was lost through foreclosure. The record further shows that Van Houten died testate, in King county, Wash., January 25, 1904, that his widow (now Clara Wilkinson) was appointed in said county administratrix of his estate, that in due course the administration was settled and closed, and that the property which came into the hands of the administratrix was not sufficient to pay the expenses of administration.

The plaintiff testifies that he resides in Salt Lake City, and has resided there for four years; that he first heard of the proceedings in which Van Houten was appointed guardian for himself and sister from Messrs. Belden & Losey, when he first started these proceedings; that that was a circumstance when he first started to look into the matter, being the latter part of 1909 or first of 1910; that the first intimation he had that he had any property interest in and about Spokane was while he was on leave of absence from his ship on a short visit to his father and stepmother, the present Mrs. Newberry, in the fall of 1904; that his stepmother was giving him a "little talking to about saving money," and told him that she thought he had some property in Spokane, mentioning the Carnegie Library site; that she told him his mother had left the Carnegie Library site, which rightfully belonged to him, that his father had mortgaged it and the mortgage had been foreclosed, and that if he brought suit within a year after he became of age he might possibly recover the property, but it would get his father into trouble; that he believed what his stepmother told him, that if he brought suit he would get his father into trouble, and that he was influenced in his silence and failure to bring suit by such statement; that he did not bring the suit within the year, as suggested, for that reason; that he was very young when he left Spokane first; that the family went to Europe when he was between 9 and 10 years old; that they returned to Spokane, but did not bring him with them; that he was left in Amherst, Mass., and attended school there for over a year and a half, when he returned to Spokane; that he remained in Spokane a short time, and then went with the family to New York; that he was in school in New York; that he entered the navy when he was a little over 15 years of age, and was discharged the day before his twenty-first birthday; that he visited his people from time to time while he was in the navy; that it was during one of these visits that he had the conversation with his stepmother regarding the Carnegie Library property; that he was about 19 years old at the time of the conversation, and that she gave him no reason why he might be able to bring the suit; that he knew of the old home site, where the Carnegie Library now stands, in a vague sort of way; that he was in Spokane once after he became of age, some time in March, 1908, but stayed only a few hours, and departed, his father having given him some money; that he received a letter from his father in the fall of 1909, asking him for a quitclaim deed to some land; that he answered this, making inquiry about the point involved, and his father replied that there was a technical question involved, which it was thought should be straightened out; that thereupon he took the matter up with his lawyers, and through their

investigation the guardianship proceedings were discovered, which was the first he knew of such proceedings.

Mrs. Newberry, the stepmother of plaintiff, corroborates him relative to the conversation respecting the Carnegie Library property, about which she says: "I told him he could bring this suit to recover his mother's interest in the property where the public library now is; that his father had tried to save it for him, and did as long as he could, and finally he had to give it up; if he would save his money, when he was 21 he could bring suit himself; but I further explained to him, if he didn't bring suit before he was 22, the statute of limitations would run against him." She further testifies that, when plaintiff was very young and in school at Amherst, Mass., he received a notice of some kind, which the boy did not understand, although she attempted to explain the meaning to him. This notice was perhaps a summons in the foreclosure proceeding by the mortgagee against the property formerly partitioned.

Arthur A. Newberry testifies in effect that, at the time of the sale under the partition suit no money whatever passed from McEwen to the referee appointed by the court to sell the property, and none passed from the referee to either Newberry or Van Houten as guardian for the minors, but that Newberry and Van Houten each gave his receipt to the referee, acknowledging payment by him to each of the sum of $33,400; that no money whatever passed during the partition proceedings and the sale of the property, or the execution of the referee's deed therefor; that the entire proceeding was a scheme contrived by Newberry, so that he could get the title to the property in his own name, and thereby be enabled to mortgage the same for additional money; and that McEwen, as soon as he received a deed from the referee, deeded the property to Newberry without consideration, which was also a part of the scheme.

Belden & Losey and Graves, Kizer & Graves, all of Spokane, Wash., for appellant.

H. M. Stephens, of Spokane, Wash., for appellees Wilkinson and Van Houten.

P. F. Quinn and E. J. Cannon, both of Spokane, Wash., for appellee Monaghan.

Before GILBERT and ROSS, Circuit Judges, and WOLVERTON, District Judge.

WOLVERTON, District Judge (after stating the facts as above). This country adopted the equitable jurisdiction of the High Court of Chancery of England when the Constitution was framed, and it is the jurisdiction exercised by the federal courts to the present time, saving such modifications as it has undergone through usage and by action of Congress, and, in practice, through the rules adopted by the Supreme Court. It has been said that the jurisdiction "is subject to neither limitation nor restraint by state legislation, and is uniform throughout the different states of the Union." Payne v. Hook, 7 Wall. 425, 430, 19 L. Ed. 260. See, also, Robinson v. Campbell, 3 Wheat. 212, 4 L. Ed. 372; McConihay v. Wright, 121 U. S. 201, 7 Sup. Ct. 940, 30 L. Ed. 932; Arrowsmith v. Gleason, 129 U. S. 86, 9 Sup. Ct. 237, 32 L. Ed. 630. This jurisdiction in its parent country undoubtedly extended to the administration of estates of deceased persons. Says Mr. Pomeroy:

"The relation subsisting between executors and administrators on the one hand, and legatees, distributees, and creditors on the other, has so many of the features and incidents of an express active trust that it has been com-

pletely embraced within the equitable jurisdiction in England, and also in the United States, where statutes have not interfered to take away or to abridge the jurisdiction." 1 Pom. Eq. Jur. § 156.

The states, however, through their statutes and procedure, have vitally encroached upon this special subject of equitable jurisdiction. In a great majority of the states, the original jurisdiction over administrations in all ordinary cases, unless attended with special circumstances, such as fraud, or with some equitable feature, such as a trust, is either expressly or practically abrogated. Courts of equity, in the absence of such special circumstances or distinctly equitable feature, either do not possess or will not exercise the jurisdiction, but leave the whole matter of administration to the special probate tribunals. In a few of the states only does the full equitable jurisdiction over administrations remain unimpaired, and in these it is not exclusive, but concurrent with systems of administration conferred upon probate courts. Sections 348, 349, 350, Pom. Eq. Jur.; 16 Cyc. 92–95.

So it is the doctrine of the English chancery that, whenever an infant succeeds to property, that court takes the management of its person and estate. "In this matter, however," says Mr. Pomeroy, "as in the administration of decedents' estates, the Legislature has intervened, and the probate courts practically appoint all guardians, and control their official actions. Under their general power in cases of trust and of accounting, the American courts of equity may give all proper relief to wards against their guardians; but the peculiar jurisdiction over the persons and estates of infants, possessed by the English chancery, does not, to any extent, exist in the American equity jurisprudence." Pom. Eq. Jur. § 78. At another place (section 1097) the author further says:

"Equity has, therefore, a general jurisdiction, at the suit of the wards or other beneficiaries, to compel a performance of the trust duties, to relieve against violations of these trust obligations, to direct an accounting and final settlements of the quasi trust, and to grant other special relief made requisite by the circumstances."

[1] Equity jurisdiction in the federal courts, however, may yet be said to extend to the administration of the estates of deceased persons sub modo—that is, where it concerns citizens and residents of different states; but it is an inexorable rule that, in the exercise of such jurisdiction, such courts will be governed and controlled by the statutory rules and regulations of the states pertaining to the administration and the settlement of such estates. Security Trust Co. v. Black River National Bank, 187 U. S. 211, 23 Sup. Ct. 52, 47 L. Ed. 147. In short, the federal equity courts, when occasion requires, for the protection of proper parties concerned, will administer the local probate procedure, but in obedience to the local law governing the same. While it is said that "the several states of the Union necessarily have full control over the estates of deceased persons within their respective limits" (Yonley v. Lavender, 21 Wall. 276, 279, 22 L. Ed. 536), and that the federal court "has no original jurisdiction in respect to the ad-

ministration of a deceased person" (Byers v. McAuley, 149 U. S. 608, 619, 13 Sup. Ct. 906, 37 L. Ed. 867), it is further declared that "the general equity jurisdiction of the Circuit Courts of the United States to administer, as between citizens of different states, the assets of a deceased person within its jurisdiction cannot be defeated or impaired by laws of a state undertaking to give exclusive jurisdiction to its own courts." Lawrence v. Nelson, 143 U. S. 215, 223, 12 Sup. Ct. 440, 36 L. Ed. 130. See, also, Green's Administratrix v. Creighton et al., 23 How. 90, 16 L. Ed. 419; Payne v. Hook, 7 Wall. 425, 19 L. Ed. 260.

It is upon the ground of a trust impressed by law that the equitable jurisdiction over estates primarily rests, and its remedial powers may be exercised as in administration suits, and in creditors' bills instituted against executors or administrators, or after distribution against legatees, for the purpose of charging them with a liability to apply the assets of the decedent to pay his debts and the like. Borer v. Chapman, 119 U. S. 587, 600, 7 Sup. Ct. 342, 30 L. Ed. 532.

[2] The federal courts being governed and controlled by the local laws respecting the administration of estates, their jurisdiction, in so far as it is exercised, is necessarily concurrent with the probate jurisdiction of the several states; and, being concurrent, it follows that the orders and judgments of such probate courts in the due and orderly administration of such estates are conclusive and binding upon the federal courts. This latter deduction has been observed to be the case in the matter of the succession of estates. Johnson v. Waters, 111 U. S. 640, 667, 4 Sup. Ct. 619, 28 L. Ed. 547.

[3] This court has chancery jurisdiction of the present controversy because of fraud alleged in the bill and shown by the testimony, and for an accounting. Sections 78 and 1097, Pom. Eq. Jur.; Johnson v. Waters and Arrowsmith v. Gleason, supra.

[4] Whatever good intentions may have prompted Newberry in disposing of his children's inheritance, the disposition made was a manifest constructive fraud upon their rights, and it is bootless to speculate as to the probability or possibility of the property being lost to the estate in any event by reason of prior incumbrance or financial entanglement. Van Houten became a party to the fraud by lending himself to become guardian of the minor heirs, and by receipting in his official capacity for money which he never actually received, purporting to be the proceeds of the sale at partition of their inheritance. The device enabled Newberry, the father, to possess himself of the inheritance, and afterwards to use it for his own purpose, so that it was lost to the heirs. Being a party to such device, Van Houten by the plainest principles of estoppel by record and in pais, was ever afterwards precluded from denying that he received the money. Neither can his sureties be heard to say that he never received it. Judge of Probate v. Sulloway, 68 N. H. 511, 44 Atl. 720, 49 L. R. A. 347, 73 Am. St. Rep. 619;

Cranford et al. v. Brewster, 57 Ga. 226; Pfeiffer & Sullivan v. Knapp, 17 Fla. 144; Byrd & Chrisfield's Executors v. State, Use of Stewart, 44 Md. 492; State ex rel. Weaver v. Weaver et al., 92 Mo. 6, 4 S. W. 697.

[5] As it concerns Clara Wilkinson, either as administratrix of the estate of B. C. Van Houten or in her individual capacity, and Eugene Van Houten, there can be no relief whatsoever against them. The estate of Van Houten proved to be hopelessly insolvent, to the extent that it was insufficient to pay even the expenses of administration, and was wholly and finally settled in probate, and the administratrix discharged. There is no suggestion that this proceeding in probate was attended with any irregularity whatever. Thus the order and judgment of the probate court in settling the estate and discharging the administratrix are conclusive and binding upon this court. Being discharged, it is futile to attempt to charge Mrs. Wilkinson in her administrative capacity; and, neither she nor Eugene Van Houten having come into possession of any of Van Houten's property or estate, they could not be held personally for Van Houten's defalcation, unless they had violated some duty which they owed to the complainant entailing such liability. It has been held that:

"The administrator is the usual and proper person to present the account of the deceased guardian for settlement." Chapin, Judge, v. Livermore et al., 13 Gray (Mass.) 561, 562.

But there is no rule of law of which we are aware rendering the administrator personally liable to the ward for a failure to render such service. Indeed, in the present case, if the account of Van Houten as guardian had been presented, it is evident it would have been of no avail to the ward, as the administratrix had at no time property or funds in her hands in any way applicable to the account. So that, in either view, there could be no personal liability on the part of Mrs. Wilkinson arising from her acts as administratrix. Much less would any personal liability arise on her part, or on the part of Eugene Van Houten, by reason of being heirs of Van Houten's estate. It is clear, therefore, that the complaint should be dismissed as against Mrs. Wilkinson and Eugene Van Houten.

[6] In defense of plaintiff's cause of suit, the defendant Monaghan invokes the statute of nonclaim, and also the statute of limitations fixing the time beyond which an action cannot be maintained against the sureties upon an executor's, administrator's, or guardian's bond after the death of the principal, prescribed by the statutes of the state of Washington. The statute of nonclaim is presented as barring all right of action or suit upon the demand relied upon for recovery; and, that being barred, it is insisted that the surety is released also. Section 1470, Rem. & Bal. Code, provides that:

"Every executor or administrator shall, immediately after his appointment, cause to be published in some newspaper printed in the county, if there be one, if not, then in such newspaper as may be designated by the court, a

notice to the creditors of the deceased, requiring all persons having claims against the deceased to present them, with the necessary vouchers, within one year after the date of such notice, to such executor or administrator, at the place of his residence or transaction of business, to be specified in the notice. Such notice shall be published as often as the court shall deem necessary, but not less than once in a week for four successive weeks."

And section 1472 that:

"If a claim be not presented within one year after the first publication of the notice, it shall be barred."

The word "claim," in the sense as used by the statute, has been construed by the Supreme Court of the state of Washington to be of broad significance, and "to include every species of liability which the executor or administrator can be called on to pay, or to provide for the payment of, out of the general fund belonging to the estate." Barto v. Stewart et al., 21 Wash. 605, 59 Pac. 480, 482. This case expressly overrules the case of Neis v. Farquharson, 9 Wash. 517, 37 Pac. 697, in any bearing it has upon the point so decided. This would seem to include the claim of plaintiff, when it is considered that no funds whatever of his went into the hands of his guardian, and none, therefore, could have gone into the hands of the administratrix of his guardian's estate. He could have no other demand, except a personal claim against the estate, occupying the position of a general creditor, for so much money as might have been found due on a proper showing or accounting. It could have been in no sense a claim or demand for a specified fund or specific property traceable as the fund or property of the ward separable from the property of the estate.

The statute is not without its prototype elsewhere, which has received the like broad construction, and, as remarked by the trial court, is enforced with even greater strictness than general statutes of limitation; its object being to secure an early and final settlement of estates, to the end that what shall remain may be distributed to the heirs or next of kin free from incumbrances or charges which would lead to protracted litigation. Fretwell et al. v. McLemore et al., 52 Ala. 124; Rhodes v. Hannah's Administrator, 66 Ala. 215; Taylor, Adm'r, v. Robinson, Adm'x, 69 Ala. 269; Walker v. Byers, 14 Ark. 247; Bennett et al. v. Dawson, Adm'x, et al., 18 Ark. 334; Brearly v. Norris, 23 Ark. 169; Patterson v. Mc-Cann, 39 Ark. 577; Purcelly et al. v. Carter, Adm'r, et al., 45 Ark. 299; Fowler v. True, 76 Me. 43; Attorney General v. Brigham, 142 Mass. 248, 7 N. E. 851; Lathrop v. Bampton, 31 Cal. 17, 89 Am. Dec. 141; McGrath v. Carroll, 110 Cal. 79, 42 Pac. 466.

Such statutes are in proper cases given ample effect in the federal courts, and, to illustrate with what scope and strictness they are enforced, we quote from Morgan v. Hamlet, 113 U. S. 449, 451, 5 Sup. Ct. 583, 28 L. Ed. 1043, a case instituted in equity to enforce certain demands against the heirs at law of John G. Morgan, deceased, who came into property of the estate sufficient to satisfy the demands of claimants, where it was answered that the demands were not presented to the administrator within the limita-

tion of the nonclaim in Arkansas. Of the complainants, one became of age less than three years and one within a year and five months prior to the date of the institution of the suit. Neither of these ever had a guardian, and they allege their ignorance of the frauds charged which form in part the basis of the suit. The court says:

"It is sought, in argument on behalf of the appellants, to distinguish their case, at least the case of the two infant children of Samuel D. Morgan, from any case within the statute of nonclaim, on the ground that at the death of their father his title to the real estate, which constituted the plantation, descended to them as his heirs at law, and thereafter as to the operations conducted by John Morgan in 1864 and 1865, having no guardian, the latter was in equity their representative and guardian de son tort and trustee, so that upon his death, and until they arrived at age, there was no one competent to make a demand against his administrator, within the terms of the statute. But we are unable to appreciate the force of this supposed distinction. The statute in question contains no exception in favor of claimants under disability, of nonage, or otherwise. The claim of the complainants against John G. Morgan was adverse to his administration, although it may have originated in consequence of a relation of trust; and there is no ground, that we are able to understand, on which it can be excepted out of the operation of the statute in question. Their claim was equally against the administrator of John G. Morgan, whether the latter be considered as the defaulting partner of themselves or of their father. Whatever its description, it was a claim against the estate of John G. Morgan, and for which his personal representative was in the first instance liable; and the statute is a bar to every such claim, unless presented within the time prescribed."

The doctrine was reaffirmed in Security Trust Co. v. Bank, supra, with even stronger emphasis. It will be observed, also, in the examination of this case, that it is controlled by the decisions of the Supreme Court of Arkansas in its construction and application of the statute of nonclaim obtaining in that state; the opinion of the court citing the cases of Walker v. Byers, Bennett v. Dawson, and Brearly v. Norris, supra.

Further than this, it is settled that the federal courts will adopt and follow the decisions of the highest courts of the states in construing and applying local statutes of limitation. Bauserman v. Blunt, 147 U. S. 647, 13 Sup. Ct. 466, 37 L. Ed. 316. This statute of nonclaim, unless suspended or barred because of equitable considerations—a matter to be considered later—is effective to extinguish the liability of the principal, and, that being extinguished, there can exist none against the surety. Spokane County v. Prescott, 19 Wash. 418, 53 Pac. 661, 67 Am. St. Rep. 733.

[7] As to the other statute of limitation, it is provided (section 1432, Rem. & Bal. Code) that:

"All actions against sureties shall be commenced within six years after the revocation or surrender of letters of administration or death of the principal."

And by section 1633 the provisions of this section are made to "apply to bonds taken of guardians." Van Houten, the guardian, died January 25, 1904, and this suit was instituted February 2, 1910, so that the six-year limitation of the statute had clearly run. There is strong authority to the effect that the terms of the statute inhere in the surety's contract in entering upon the bond of the guardian, and

that he is not bound beyond the terms of the bond; that is to say, one of the terms being, when read in view of the statute, that he shall not be bound beyond six years after the death of his principal. Hudson v. Bishop (C. C.) 32 Fed. 519; s. c., 35 Fed. 820. But this question we do not decide.

It is stoutly urged that neither of these limitation statutes can stand in the way of equitable interposition on account of fraud practiced, and the concealment thereof by the alleged delinquent party, where the fraud remains undiscovered until a recent date prior to the institution of the suit for relief from the effect of such fraud. Counsel's position is that, in a court of equity, these statutes of limitation do not run against one who, because of active fraud or concealment equivalent thereto, had no notice of his rights, and the cause of action will be deemed to have accrued only when he knew, or by reasonable diligence could have known, that such cause existed.

In general, courts of equity, being courts of conscience, are not bound by the rigidity of statutes of limitation, as are courts of law. When conditions are equal—that is, when the reasons prompting the exercise of judicial power are of equal potency and applicability— no further reasons being present, they will act upon the analogy of, or, to be more exact, rather in obedience to, the limitations of law. Badger v. Badger, 2 Wall. 87, 94, 17 L. Ed. 836. But otherwise they will adopt such reasonable limitations as are prompted by equity and good conscience, in view of the special exigencies of the case. This is not to say that the appropriate legislative authority might not adopt limitations that would be binding upon courts of equity as well as upon courts of law; but, as respects the general legislation pertaining thereto, although it may extend to special subjects, courts of equity have never been inexorably restrained or circumscribed by such legislation or the limitation of actions by general law. This observation bears with peculiar force where the equitable jurisdiction is exercised in the federal courts and the limitations are regulated by state legislation.

[8, 9] Limitations of actions are designed for the peace and repose of society against interminable litigation, and are justly regarded as wholesome and salutary regulations. But they sometimes operate as engines of injustice, where parties have not had fair opportunity with their adversaries of presenting their cause in time. A familiar case is where fraud forming the basis of suit has been willfully concealed and purposely kept from the knowledge or cognizance of the party concerned until the statute has run. In such a case equity will interpose to remove the bar and do justice, and it acts here without regard to the letter or analogy of the statutes of limitation. It may even cut short the limitations of the law, and it will adopt its own limitations, to meet the special and peculiar exigencies of the occasion. Reference may be made to a few cases only which establish the principle. In Stearns v. Page, 7 How. 819, 828 (12 L. Ed. 928), the court says:

"Statutes of limitation form a part of the legislation of every government, and are necessary to the peace and repose of society. When they are addressed to courts of equity as well as to courts of law, as they seem to be in

all cases of concurrent jurisdiction (as in matters of account), they are equally obligatory on each court. In other cases, courts of equity act upon the analogy of limitations at law, and sometimes upon their own inherent doctrine of discouraging, for the peace of society, antiquated demands, by refusing to interfere where there has been gross laches or unreasonable delay. They also interfere in many cases to prevent the bar of the statutes, where it would be inequitable or unjust; as, for example, if a party has perpetrated a fraud which has not been discovered till the statutable bar may apply to it in law, courts of equity will interpose and remove the bar out of the way of the injured party. In cases of mistake, also, as well as fraud, they will not consider the statute as running till after the discovery of the mistake, as laches cannot be imputed to the injured party till the discovery of the fraud or mistake has been made. 2 Story's Eq. § 1520. But as lapse of time necessarily obscures the truth and destroys the evidence of past transactions, courts of chancery will exercise great caution in sustaining bills which seek to disturb them. They will hold the complainant to stringent rules of pleading and evidence, and require him to make out a clear case."

In Williams v. Neely, 134 Fed. 1, 13, 67 C. C. A. 171, 183 (69 L. R. A. 232):

"In the application of the doctrine of laches, the settled rule is that courts of equity are not bound by, but that they usually act or refuse to act in analogy to, the statute of limitations relating to actions at law of like character. * * * The meaning of this rule is that, under ordinary circumstances, a suit in equity will not be stayed for laches before, and will be stayed after, the time fixed by the analogous statute of limitations at law; but if unusual conditions or extraordinary circumstances make it inequitable to allow the prosecution of a suit after a briefer, or to forbid its maintenance after a longer, period than that fixed by the statute, the chancellor will not be bound by the statute, but will determine the extraordinary case in accordance with the equities which condition it."

In Kentucky Coal & Timber D. Co. v. Kentucky Union Co., 187 Fed. 945, 948, 110 C. C. A. 93, 96:

"State statutes of limitation are prescribed for the tribunals of the state. They are not, ex propria vigore, of any force in the courts of the United States. They may be, and in many instances have been, adopted by acts of Congress as laws of the United States. There is no general statute of limitations in the laws of the United States relating to suits in equity. But, speaking now of the equity courts of the United States, there has been for the sake of conformity a disposition to accept the statutory regulations of the states prescribing the time within which suits may be brought. And this practice has ripened into a rule which will be enforced whenever by observing it the court is not required to abrogate its own principles, in which case it will protect its own jurisdiction. Alsop v. Riker, 155 U. S. 448, 460, 15 Sup. Ct. 162, 39 L. Ed. 218; Patterson v. Hewitt, 195 U. S. 309, 25 Sup. Ct. 35, 49 L. Ed. 214. Instances are found where those courts have enforced the doctrine of laches in favor of defendants where the lapse of time has been shorter than that prescribed by state laws, but where the peculiar circumstances gave rise to an equity which the court was bound to protect. By the same token it would allow a longer period for bringing suit than that prescribed, when by fraud or concealment of the cause of action had not been discovered, or would not by reasonable diligence have been discovered."

And in 19 Am. & Eng. Enc. of Law (2d Ed.) 243, it is said:

"It has always been the rule in equity that the defendant's fraudulent concealment of a cause of action will postpone the running of the statute until such time as the plaintiff discovers the fraud. The defendant having, by his own wrongdoing, prevented the plaintiff from instituting his suit, will not be permitted to take advantage of his own wrong by setting up the statute as a defense."

See, also, Bailey v. Glover, 21 Wall. 342, 22 L. Ed. 636; Rosenthal v. Walker, 111 U. S. 185, 4 Sup. Ct. 382, 28 L. Ed. 395; Kirby v. Lake Shore, etc., Railroad, 120 U. S. 130, 136, 7 Sup. Ct. 430, 30 L. Ed. 569; Schroeder v. Young, 161 U. S. 334, 344, 16 Sup. Ct. 512, 40 L. Ed. 721; Eddy v. Eddy, 168 Fed. 590, 93 C. C. A. 586; Horton v. Stegmyer, 175 Fed. 756, 759, 99 C. C. A. 332, 20 Ann. Cas. 1134.

As it pertains to the statute of nonclaim, we find cases of marked analogy to the present. Allen v. Conklin, 112 Mich. 74, 70 N. W. 339, cited by plaintiff's counsel, is one of them. Without reciting the facts, it is sufficient to say that it was held that:

"Where a guardian, since deceased, has fraudulently appropriated funds of the ward' to his own use, equity has jurisdiction to require his executors to account to the ward and to decree a sale of land of the estate to pay the amount found due, though, because of lapse of time, the probate court cannot allow the claim nor decree a sale of land to pay it."

Another case decided in the federal court is Johnston v. Roe (C. C.) 1 Fed. 692. The debtor having died, his estate was administered under the laws of Missouri and fully settled and closed, and the claim in question was not proven in probate. Certain real and personal property passed to the heirs. The claim sued on was one having its origin in fraud, which was successfully kept concealed from the claimant, and the purpose of the suit was to subject the property of the heirs to the payment of the claim. It was held that a federal court would assume jurisdiction of the suit against the estate of the decedent for the recovery of the debt alleged to have been fraudulently concealed, although the claim was barred by the statute of limitations of the state in which such court had territorial jurisdiction. At the close of his opinion the learned judge said:

"The rule that the statute of limitations does not run in favor of one who perpetrates a fraud while he conceals it from the party injured, as a general doctrine of equity jurisprudence, is too well settled to require the citation of authorities."

And in a still later case—Chewett v. Moran (C. C.) 17 Fed. 820— which was to subject real estate in the hands of the heirs to the payment of the debts of their ancestors, it was held that:

"It is not an absolute bar to the maintenance of such bill in a federal court that the estate of the ancestor was administered in the probate court of the state, that commissioners were appointed to audit claims against the estate, that a time was limited within which all claims must be presented, and that plaintiff did not appear before such commissioners or offer to make proof of her debt, notwithstanding a law of the state declared that all claims against such estate not so presented should be forever barred."

[10] In a general sense, laches is defined as:

"A neglect to do what in the law should have been done for an unreasonable or unexplained length of time under circumstances permitting diligence." 24 Cyc. 840.

It is in large sense a relative term, dependent upon the attendant and peculiar conditions and circumstances of the case in hand. What would be laches in one case would fall short of it in another. It was

said by Mr. Justice Lord, in Neppach v. Jones, 20 Or. 491, 26 Pac. 569, 849, 23 Am. St. Rep. 145, quoting from an English case:

"Two circumstances, always important in such cases, are the length of the delay and the nature of the acts done during the interval, which might affect either party, and cause a balance of justice or injustice in taking one course or the other, so far as relates to the remedy."

Many cases might be cited illustrating its application. See Alsop v. Riker, 155 U. S. 448, 460, 461, 15 Sup. Ct. 162, 39 L. Ed. 218; Patterson v. Hewitt, 195 U. S. 309, 317, 318, 25 Sup. Ct. 35, 49 L. Ed. 214; Northern Pac. Ry. Co. v. Boyd, 177 Fed. 804, 823, 824, 101 C. C. A. 18; Wilson v. Wilson, 41 Or. 459, 69 Pac. 923; Miller v. Ash, 156 Cal. 544, 105 Pac. 600.

[11] Now to apply the authorities to the present controversy. It is sought to hold the defendant Monaghan to strict accountability by way of estoppel upon a purely legal right. He cannot be heard to say that the money coming into the hands of his principal, the guardian of plaintiff, is either more or less, although, if it were not for the peculiar force of the estoppel, it might or might not (we cannot say from the record) have been shown that the plaintiff's real demand was of greatly diminished proportions. No accounting is in fact permissible that the just and actual sum due plaintiff, if in reality there is any, may be ascertained. The plaintiff arrived of age September 8, 1906. This suit was instituted February 2, 1910, more than three years and four months later. In the fall of the year 1904 plaintiff had a conversation with his stepmother, in which he was told that, if he would bring a suit within a year after he was of age, he could probably recover an interest in his mother's property, referring particularly to the Carnegie Library site. There is no doubt about the conversation. His stepmother affirms it, and plaintiff himself admits it. He was then 19 years of age, and mentally capacitated to grasp the suggestion and realize what it meant to him. It was furthermore suggested at the time that a lawsuit of the kind would probably get his father into trouble, which latter suggestion impelled him to silence. Hence he made no further inquiries until his father wrote to him, at Salt Lake City, Utah, after his discharge from the navy, requesting him to sign a quitclaim deed for clearing up the title to some property which his father had conveyed years before. The letter bears date October 30, 1909. This led to his submitting the matter to attorneys for inquiry, and a search among the superior court records led to discovery of the receipt of Van Houten which forms the basis of the controversy.

Counsel for plaintiff contends that this was the first discovery of the fraud, and that suit was timely instituted after such discovery. We are firmly of the view, however, that plaintiff was chargeable with knowledge of this fact from the information given to him by his stepmother. The receipt related to the same matter spoken of by his stepmother, and was found in and constituted a part of the same record which was involved by her suggestion. The record was one which imports constructive notice, and, almost without question, if he had pursued inquiry from his stepmother's suggestion, with a view to possessing himself of his supposed interest in his mother's property, he

would have ascertained the true conditions, which were subsequently ascertained by the later search. He then delayed pursuit of the matter on account of consideration for his father; but he is now, at a much later date, insistent upon his alleged rights. In Miller v. Ash, supra, in an exhaustive and well-considered opinion, the court says:

"It is one of the settled general rules in this class of cases that if the party seeking to avoid the operation of the statute of limitations, or to excuse the delay which would, in the absence of a sufficient excuse, amount to such laches as would defeat his right of action, possessed information or knowledge of extraneous facts and circumstances, or, in other words, of matters in pais, which, although not directly tending to show the existence of a prior conflicting right, are sufficient to put him, as a prudent person, upon inquiry, he is then charged with constructive notice of all that he might have learned by an inquiry prosecuted with reasonable diligence. Pom. Eq. Juris. § 610. It is said by the same author that from the existence of such circumstances 'the legal presumption arises that he has obtained information of what he might thus have learned. In every such case the first question is whether the facts of which the party has information are sufficient to put him upon an inquiry, so as to raise the prima facie presumption. The further question is then presented whether he has made a due inquiry without discovering the truth, so as to overcome the presumption and defeat the notice, or whether he has so neglected this duty that the presumption remains unshaken and the notice effective.' "

Again, says the court, in Nash v. Ingalls, 101 Fed. 645, 648, 41 C. C. A. 545, 548:

"The law requires that, in order to relieve himself from the consequence of delay in seeking a remedy for a wrong, the party should have given reasonable attention to his own affairs, and he is chargeable with knowledge of such facts as such reasonable attention would have afforded him."

So, also, in Foster v. Railroad Co., 146 U. S. 88, 99, 13 Sup. Ct. 28, 32 (36 L. Ed. 899):

"The defense of want of knowledge on the part of one charged with laches is one easily made, easy to prove by his own oath, and hard to disprove; and hence the tendency of courts in recent years has been to hold the plaintiff to a rigid compliance with the law which demands, not only that he should have been ignorant of the fraud, but that he should have used reasonable diligence to have informed himself of all the facts."

Reasonable attention to an affair peculiarly his own would have led plaintiff, at least soon after his arrival at age, to the possession of all the knowledge he acquired immediately prior to the bringing of the suit. But he delayed the institution of his suit until the statute of limitations had fully run against him and in favor of the surety. If it be said that the delay has placed the defendant Monaghan in no worse condition than if the suit had been promptly instituted when the plaintiff arrived of age, it may be answered as to this: We cannot say. It is a fact that four sureties signed Van Houten's bond, and but one is made a party here. All were made parties to the original complaint, but for some reason all have been dropped from the second amended complaint except Monaghan, for what reason we have not been advised. Whether the others have died or become insolvent, or why they are not here, is not explained. It is reasonable to suppose that, if alive and solvent, they also would have been retained as parties.

It might not have been necessary to the cause of suit to retain them, but it should at least have been shown that Monaghan's position is no worse now by reason of the delay than it was previously.

[12] It is suggested that it was Monaghan's duty to present the guardian's account to his administrator for settlement and allowance, and that in not doing so he participated in concealing the fraud complained of. He might have so presented the account, and it would not have been amiss for him to do it; but it is not expected that a surety on a guardian's bond will actively concern himself with the interest of the ward. That is a matter for the guardian, and Monaghan's failure so to interest himself can hardly entail the charge of participation in concealment of the fraud.

We are of the opinion that, had the suit been seasonably instituted after the plaintiff became of age, the bar of the statute of nonclaim would not have stood in the way of his recovery, and, of course, had the suit been brought but a few days earlier, the statute of limitations respecting sureties on guardians' bonds would not have run at all. We are impelled to the conviction, however, that the delay suffered by plaintiff after he was in possession of information challenging further inquiry on his part, and after he had arrived at legal age, under the facts and circumstances attending the controversy, amounts to laches on his part, and a court of chancery will not now interpose to remove the bar of either of such statutes of limitation, nor will it afford him the relief prayed.

The decree of the District Court will be affirmed, with costs to the appellees.